## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MIRIAM HYMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-227-SLR |
| | ) | |
| CHILD, INC., | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANT, CHILD, INC., FOR SUMMARY JUDGMENT[1]

Defendant, Child, Inc., hereby moves for summary judgment and, in support thereof, avers as follows:

1.      Plaintiff filed a Complaint on April 6, 2006 naming Child, Inc. as a defendant. D.I. 1.

2.      Plaintiff's Complaint purports to allege a racial discrimination claim based upon a violation of 42 U.S.C. § 1981 and includes a claim for breach of contract and breach of the implied covenant of good faith and fair dealing under Delaware law.  See plaintiff's Complaint, attached hereto as Exhibit "A".

3.      Defendant, Child, Inc., asserts that there is no genuine issue of material fact and that summary judgment is warranted in its favor.

4.      Summary judgment may be entered if "the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits[2], if any, show that there is no

---

[1] Pursuant to Local Rule 7.1.2, Defendant submits this Memorandum of Points and Authorities in lieu of an Opening Brief.  Defendant reserves the right to file a Reply Brief.

[2] Plaintiff did not issue discovery to and took no depositions of defendant, Child, Inc. or its current or former personnel.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Equimark Comm. Finance Co. v. C.I.T. Financial Serv. Corp.*, 812 F.2d 141, 144 (3d Cir. 1987). If evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, at 249; *Equimark*, 812 F.2d at 144. Where the record, taken as a whole, could not "lead a rational trier of fact to find for the nonmoving party, summary judgment is proper." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574 (1986).

5.    42 U.S.C. § 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

To establish a prima facie case of racial discrimination under 42 U.S.C. § 1981 plaintiff must show "(1) that [she] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts[.]" *Brown v. Philip Morris Inc.*, 250 F.3d 548, 569 (3d Cir. 2002).

Claims under 42 U.S.C. § 1981 must be evaluated according to the burden-shifting analysis set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). That analysis proceeds in three steps. First, the plaintiff "must carry the initial burden … of establishing a prima facie case of … discrimination." *McDonnell Douglas*, 411 U.S. at 802. "The burden then must shift to the [defendant] to articulate some legitimate, nondiscriminatory reason for the [plaintiff's] rejection." *Id*. The burden then shifts again to the

plaintiff "to show that [the defendant's] stated reason for respondent's rejection was in fact pretext." *Id*. at 804.

6. Plaintiff appears to base her allegation that Child, Inc. discriminated against her under § 1981 on her assertion that she was terminated because of her race. Plaintiff cannot show, and has not offered any evidence to show that Child, Inc.'s actions interfered with any contract she may have had with Child, Inc. Plaintiff was hired by Child, Inc. to work as a part-time Child/Youth Service Worker at the Governor Charles L. Terry Emergency Home for Children and Youth beginning on March 23, 2005. See Affidavit of Robbie MacDonna Hoosty, attached hereto as Exhibit "B". A letter confirming plaintiff's appointment to the position of part-time Child/Youth Service Worker at the Governor Charles L. Terry, Jr. Emergency Home for Children and Youth dated March 22, 2005 provided that "Child, Inc. is an at-will employer". See Letter dated March 22, 2005 re: Confirmation of Part-Time Employment, attached hereto as Exhibit "C". Under Delaware law, an "at will" employee can be terminated without cause and regardless of motive. *E.I. DuPont de Nemours v. Pressman*, 679 A.2d 436, 437 (Del. 1996). The letter noted that it was "understood that either party may terminate this employment arrangement between the employee and the employer after fifteen (15) calendar day's notice, unless the employee is terminated for cause." Exhibit "C". Plaintiff indicated that she agreed to the terms of this letter by signing it on March 22, 2005. *Id*. Thus, even assuming that the relationship between Child, Inc. and plaintiff was governed by a contract, it specifically provided for plaintiff's termination. Plaintiff was still within the six (6) month orientation period during which time her performance was being evaluated at the time of her discharge on June 3, 2005. See Exhibit "B". Plaintiff's termination as an "at will" employee could not constitute an interference with her enjoyment of the benefits, privileges, terms or conditions of her contractual relationship since she had no right to remain at Child, Inc. Therefore, plaintiff fails to establish the third prong of the three-part test for the establishment of a prima facie case.

7.      However, even if plaintiff could establish a prima facie case of a violation of §

1981, which is denied, summary judgment for Child, Inc. is still appropriate.  Under the second

step of the *McDonnell Douglas* framework, the defendant bears only the burden of explaining

clearly the nondiscriminatory reasons for its actions.  Here, the evidence demonstrates that

plaintiff was terminated not because of her race but because of an accumulation of issues to the

point of discharge.  *Id.*  Plaintiff wanted to set her work schedule so that it could revolve around

her own schedule as an actress.  See Memo dated 5/27/05 from plaintiff to Director, Robbie

MacDonna and Manager, Nicole Russo re: Plaintiff's scheduling demands, attached hereto as

Exhibit "D".  Her desire to set her own schedule and her inflexibility with scheduling required

changes in other workers' schedules.  See Exhibit "B".  Plaintiff also missed mandatory staff

meetings.  *Id.*  Specifically, on April 28, 2005, plaintiff left early and missed one and one-half

hours of a mandatory meeting.  On May 24, 2005, she advised Child, Inc. that she would not be

able to attend future meetings because of her other job.  *Id.*; See also Exhibit "D".  She also

missed a mandatory meeting on May 24, 2005 which lasted three (3) hours.  See Exhibit "B".

Plaintiff was aware that she was expected to attend all staff meetings and training sessions.  See

Exhibit "C".  She had also received notice that tardiness, leaving early and absences from her

shift were *strongly prohibited*.  See Governor Charles L. Terry, Jr. Emergency Home for

Children and Youth – Schedule Policy – Part-Time dated March 22, 2005, attached hereto as

Exhibit "E".  All offenses, including tardiness, leaving early and absences were documented and

recorded.  *Id.*  Plaintiff also failed to follow instructions, agreed to instructions and then failed to

follow through, even when directed to do so several times.  See Exhibit "B".  For example,

plaintiff failed to perform inventory tasks.  *Id.*  Part of plaintiff's duties included transporting

Child, Inc. residents to school for which tasks plaintiff was provided travel directions.  *Id.*

Plaintiff failed to follow clear directions to the Gunning Bedford school and somehow ended up

in the state of Maryland without adequate explanation.  *Id.*  Plaintiff was difficult to supervise.

*Id.* She would not address her immediate supervisor directly. *Id.* Plaintiff was extremely

defensive and had a hard time listening to what supervisors had to say. *Id.* She was given verbal

directions on numerous occasions about her performance and attitude. *Id.* Plaintiff also

projected her own values onto residents. *Id.* For example, plaintiff was advised that a particular

resident might not work through an issue in a timely manner that suited plaintiff. *Id.* Plaintiff,

however, wanted the resident to put his/her issues aside and be able to act the way plaintiff

wanted him/her to act because of her own past. *Id.* The evidence demonstrates and supports

Child, Inc.'s assertion that plaintiff's discharge was the result of an accumulation of issues,

including her inability to carry out and fulfill her employment duties. Thus, the burden rests with

the plaintiff to show that this explanation is merely a pretext for discrimination. *See McDonnell*

*Douglas Corp.,* 411 U.S. at 804.

　　　　Plaintiff has not and cannot present sufficient evidence which would "raise a genuine

issue of material fact as to whether [Child, Inc.'s] proffered reasons were not [their] true reasons

for the challenged … action". *See Stewart v. Rutgers, The State University*, 120 F.3d 426, 433

(3d Cir. 1997); *see also Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (stating that "to

defeat summary judgment where the defendant answers the plaintiff's prima facie case with

legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence,

direct or circumstantial, from which a reasonable factfinder could reasonably either (1)

disbelieve the … articulated legitimate reasons; or (2) believe that an invidious discriminatory

reason was more likely than not a motivating or determinative cause of … the action."). The

only evidence in the record that plaintiff uses to stretch her termination to her race is the incident

with the minor child on May 25, 2005. See June 27, 2007 Deposition of Miriam Hyman at 61,

attached hereto as Exhibit "F". Plaintiff testified during her deposition that other than the May

25, 2005 incident she did not have any additional facts to support her belief that she was fired

because of race. *Id*. at 63. However, there is absolutely no evidence to suggest that Child, Inc. intended to discriminate against plaintiff on the basis of her race with respect to that incident.

8.    Plaintiff alleges in her Complaint that, on May 25, 2005, while performing her job duties, she was assaulted by a thirteen-year-old male resident, that she was injured and that she wished to immediately press assault charges against the resident. According to plaintiff, her supervisors at Child, Inc. advised her that its policy was not to bring charges against residents and that Child, Inc. would not support her in taking such an action. She alleges that after she was terminated, Danielle Clayton, a Caucasian child/youth service worker, filed a "criminal" complaint against a Hispanic female resident for a similar incident, but that Ms. Clayton suffered no adverse employment action due to her filing of a charge.

Plaintiff's sole allegation that she was terminated while Clayton was not is insufficient to rebut Child, Inc.'s proffered reasons for terminating plaintiff. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998) ("a black plaintiff cannot establish racial discrimination by singling out one white person who was treated more favorably when there were other white persons who were treated less favorably than other black persons"). With respect to this incident, plaintiff had restrained a resident with mental health problems. To co-workers, the resident appeared terrified of plaintiff. See Exhibit "B". Plaintiff appeared to be picking on the resident by refusing to wash his clothes, which contravened Child, Inc.'s policy of requiring plaintiff and other similarly situated employees of Child, Inc. to wash residents' clothing, which policy was recorded in meeting minutes. *Id*. Plaintiff's unauthorized restraint of the male resident contravened Child, Inc. policies regarding same, which were communicated to her, not only in the initial interview, but by Ms. MacDonna Hoosty and in mandatory training which plaintiff missed in part. *Id*. Plaintiff had also acknowledged the existence of an anti-corporal punishment policy by signing it. See Child, Inc. Policy Regarding Child Abuse/Neglect In Children's Emergency Home Care dated March 22, 2005, attached hereto as Exhibit "G".

Moreover, the incident involving a white minor male resident and plaintiff was different than the incident involving Child, Inc. employee, Clayton, who is white, and a Hispanic minor female resident. <u>See</u> Exhibit "B". Child, Inc. did not want plaintiff to press charges against the white minor resident because plaintiff herself handled the incident inappropriately by restraining the resident in contravention of Child, Inc. policy.[3]  *Id.*  The white minor male resident had emotional problems and his conduct on the date of the incident could have been addressed more appropriately by patience and discussion between plaintiff and the minor resident rather than by the use of physical restraint and contact.  *Id.*  The incident involving Child, Inc. employee Clayton, a white female, and a minor Hispanic female resident, in contrast, involved an individual with long standing behavioral problems which included affirmative combative and threatening behavior by the minor Hispanic female resident.  *Id.*  The Hispanic female minor had been sent to Child, Inc. on a "no tolerance" basis and had previously been involved with Youth Rehabilitation Services.  *Id.*  During that incident, the Hispanic minor female resident had threatened Clayton and affirmatively assaulted her.  *Id.*  The police were called because of the minor Hispanic female resident's behavior and it was determined that she needed to be removed from the Child, Inc. Governor Charles L. Terry, Jr. Emergency Home for Children and Youth. *Id.*  In order to secure the removal of the minor Hispanic female resident from the Terry Shelter, Clayton had to be listed as a victim on the police report and in that sense was an individual who necessarily had to "press charges".  *Id.*  Clayton dropped the charge after the client was removed from the shelter.  *Id.*

Plaintiff has not shown that Child, Inc. intended to discriminate against her on the basis of her race.  *Lin v. Rohm and Haas Co.*, 293 F. Supp. 2d 505, 518 (E.D. Pa. 2003)(finding

---

[3] Plaintiff did press charges against the white male minor resident and several hearings in Family Court were scheduled. <u>See</u> Exhibit "B". Ms. MacDonna Hoosty was subpoenaed to attend the hearings. *Id.* Ms. MacDonna Hoosty attended hearings on two (2) occasions and Pat Payne, the resident manager, attended in her place on one occasion. *Id.* Each time they appeared, plaintiff failed to appear and plaintiff's charges against the white minor male resident were dismissed. *Id.*

insufficient evidence of intent to discriminate where the defendant identified employees outside of the protected class that were treated dissimilarly to plaintiff). Child, Inc. had a written anti-discrimination policy in effect during the time of plaintiff's employment. See Exhibit "B". Indeed, the current resident manager is African American and 73% of the staff is African American. Id. The past director of Child, Inc.'s Shelter Services was African American. Id. The current director of Child, Inc.'s Specialized Foster Care Services is African American and 80% of the foster care staff is African American. Id. At the time of plaintiff's employment, the director of Specialized Foster Care Services was also African American. Id. The only evidence that connects plaintiff's termination to her race is that Clayton was not terminated, while plaintiff was. That fact alone is not sufficient to rebut Child, Inc.'s non-discriminatory reasons for terminating plaintiff. Since plaintiff has not presented any evidence, beyond mere assertions and unsupported speculation, to show that Child, Inc. acted with a discriminatory motive, plaintiff cannot, as a matter of law and fact, pursue a claim under § 1981. Therefore, Child, Inc.'s Motion for Summary Judgment on plaintiff's claim of discrimination under 42 U.S.C. § 1981 should be granted.

9.    Plaintiff's counts of breach of contract and breach of the implied covenant of good faith and fair dealing are based upon her claim that she was always scheduled to work more than 25 hours per week, at no time worked less than 30 hours per week and on several occasions worked more than 40 hours per week. She claims she was fired because she requested a reduction in hours to 20 hours per week within the 25 hour limit referenced in the schedule policy for part-time Child youth service workers. However, plaintiff has no evidentiary support for her breach of contract and breach of the implied covenant and fair dealing claims against Child, Inc.

10.    Under Delaware law, employees are generally deemed "employees at will," meaning that they can be terminated from their employment without cause, regardless of the

employer's motive. *Dial v. AstroPower, Inc.*, 2000 Del. Super. LEXIS 324, at*3; See Exhibit "C". An exception to the at-will presumption has been carved out when there is a breach of the covenant of good faith and fair dealing, but for this exception to apply, a plaintiff must establish that he or she falls into one of four exclusive categories. *Id*. at 441-44. The four categories are: (1) where the termination violated public policy; (2) where the employer misrepresented an important fact and the employee relied on that fact to either accept a new position or remain in a present one; (3) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation earned through the employee's past service; and (4) where the employer falsified or manipulated employment records to create fictitious grounds for termination. *See Reed v. Agilent Techs., Inc.*, 174 F.Supp.2d 176, 191 (D. Del. 2001). Irrespective of the category implicated, a claim for the breach of duty of good faith and fair dealing requires employer conduct amounting to fraud, deceit, or misrepresentation. *See Peterson v. Beebe Med. Ctr., Inc.,* 1992 Del. Super. LEXIS 454, at *5, *aff'd* 1993 Del. LEXIS 142, attached hereto as Exhibit "H". In order to fall within the public policy exception to the at-will employment doctrine, a plaintiff must show (1) that the defendant's alleged conduct implicates a "public interest recognized by some legislative, administrative or judicial authority," and (2) "that the employee [occupied] a position with responsibility for advancing or sustaining that public interest." *Lord v. Souder*, 748 A.2d 393, 401 (Del. 2000). Plaintiff has failed to satisfy the above requirements. Therefore, summary judgment should be granted.

Moreover, plaintiff's timesheets reflect that she worked 12 hours for the week ending March 27, 2005, 33 hours for the week ending April 3, 2005, 31.5 hours for the week ending April 10, 2005, 33 hours for the week ending April 17, 2005, 39 hours for the week ending April 24, 2005, 32.75 hours for the week ending May 1, 2005, 38 hours for the week ending May 8, 2005, 33 hours for the week ending May 15, 2005, 39 hours for the week ending May 22, 2005, 33 hours for the week ending May 29, 2005 and 8 hours for the week ending June 5, 2005.

Plaintiff's timesheets, attached hereto as Exhibit "I". Except for three (3) weeks, April 24, 2005,
May 8, 2005 and May 22, 2005, plaintiff's work fell between the 25-35 hours permitted under the
scheduling policy. Moreover, plaintiff agreed to work a few extra hours during those weeks.
The schedule was posted in advance and plaintiff had the right to, but never chose to complain
about the hours or not work them. See Exhibit "B". Instead, she consented and readily worked
the extra hours offered to her by Child, Inc. See Exhibit "F" at 21, 76. Plaintiff was remunerated
for the additional hours that she worked. See Exhibit "B". By agreeing to work the few extra
hours in three (3) out of the eleven (11) weeks that she worked for Child, Inc., plaintiff
essentially agreed to a modification of her contract. See L. H. Doane Associates, Inc., v.
Seymour, 1985 Del. LEXIS 589, attached hereto as Exhibit "J" (a contract for employment at-
will may be modified by the parties' course of conduct).

 Plaintiff then demanded that Child, Inc. accommodate her schedule while she pursued her
primary career as an actress. See Exhibit "D". Her April 27, 2005 memo to Director, Robbie
MacDonna and Manager, Nicole Russo, requested a revamped schedule and a reduction to
approximately 20 hours per week until she was finished with her role in the Merchant of Venice
play. Id. In her May 27, 2005 request for a change in her hours, plaintiff admitted that there
would be two (2) staff meetings that she would not be able to attend due to rehearsal. Id.
Plaintiff was aware that she was expected to attend all staff meetings and training sessions as
directed by her supervisor. See Exhibit "C". Further, plaintiff's May 27, 2005 memo reflected
her own belief that her scheduling needs sounded "confusing" and that she realized that her
scheduling requests were "a lot". See Exhibit "D". Plaintiff has not presented any evidence that
Child, Inc.'s conduct amounted to fraud, deceit, or misrepresentation. Therefore, Child, Inc.'s
Motion for Summary Judgment should be granted.

 As shown, summary judgment is appropriate because the plaintiff is unable to establish a
prima facie case of discrimination. Plaintiff's termination as an "at-will" employee did not

constitute an interference with her enjoyment of the benefits, privileges, terms or conditions of her contractual relationship since she had no right to remain at Child, Inc.  In the alternative, even assuming that plaintiff has successfully established a prima facie case, which is denied, the plaintiff has not produced evidence of pretext to rebut Child, Inc.'s assertion of nondiscriminatory reasons for plaintiff's discharge.  No reasonable jury could find that plaintiff was terminated from Child, Inc. other than as a result of legitimate grounds, which included her unilateral scheduling demands, her admission that she would need to miss mandatory meetings, the incident with Child, Inc.'s client and her failure to attend previous staff meetings, among other reasons.

WHEREFORE, defendant, Child, Inc., respectfully moves this Honorable Court to enter the attached Order granting summary judgment in favor of defendant, Child, Inc., and against plaintiff.

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN


BY:   _/s/ Kevin J. Connors_
Kevin J. Connors, Esquire – I.D. # 2135
1220 N. Market Street, 5th Floor
P.O. Box 8888
Wilmington, DE  19899
(302) 552-4302
Attorney for Defendant, Child, Inc.


DATED:  September 21, 2007
15/525509.v1

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MIRIAM HYMAN,                        )
                                     )        C.A. NO.:
                    Plaintiff,       )
                                     )
        v.                           )
                                     )        TRIAL BY JURY DEMANDED
CHILD, INC.,                         )
                                     )
                    Defendant.       )

## COMPLAINT

1. Plaintiff, Miriam Hyman, is an adult African American individual who resides at 1825 S.

    23rd Street, Sigel Side Entrance, Philadelphia, PA 19145.

2. Defendant, Child, Inc. is a Delaware corporation with an address of 507 Philadelphia

    Pike, Wilmington, Delaware, 19809-2177

## JURISDICTION AND VENUE

3. This is a proceeding for declaratory and injunctive relief and monetary damages to redress

    the deprivation or rights secured to plaintiff by 42 U.S.C. §1981, as well as a breach of a

    contract claim and a common law claim brought pursuant to state law.

4. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1343(3) and 1343(4),

    conferring original jurisdiction upon this Court of any civil action to recover damages or

    to secure equitable relief under any Act of Congress providing for the protection of civil

    rights. The Court's pendent jurisdiction of claims arising under Delaware law is invoked

    pursuant to 28 U.S.C. 1367(a).

5. Venue lies in this Court pursuant to 28 U.S.C. §1391 because defendant is subject to

    personal jurisdiction in this district.

## FACTS

6.  On or about March 23, 2005 plaintiff, an African American, began employment with Child Inc. in the capacity as a part-time Child/Youth Service Worker at the Governor Charles L. Terry Jr., Emergency Home for Children and Youth.

7.  As a part time employee Plaintiff was paid $10.00 per hour and was not provided, nor made eligible, for any other employment benefits, such as health care, retirement plan, etc, which benefits are offered to full time employee of the defendant.

8.  The terms of the employment contract dictated that plaintiff would not work more than 25 hours per week, but in case of special need, not work more then 35 hours per week.

9.  After completing her initial two week training period, despite the terms of employment, Plaintiff was always scheduled to work more then 25 hours per and at no time worked less than 30 hours per week and on several occasions worked more than 40 hours per week.

10. Plaintiff never complained about the scheduled hours, was otherwise a good employee and was always willing to give the extra effort towards her employer.

11. On or about May 25, 2005 Plaintiff, while performing her job duties at the Governor Charles L. Terry Jr., Emergency Home for Children and Youth was assaulted by a 13 year old male resident .

12. As a result of the injuries she received Plaintiff determined that she wished to immediately press assault charges against the youth. However, her supervisor's at Child, Inc. advised her that the policy of the employer was not to bring charges against residents

and that Child, Inc. would not support her in taking such action.

13.   Subsequent to Plaintiff's termination Danielle Clayton, a Caucasian Child/Youth Service Worker filed a "criminal" complaint against a female resident, that is believed to be Hispanic, for a similar "incident" with a resident that occurred after the incident with Plaintiff in which Plaintiff had raised the issue of such a filing with Child, Inc. Ms Clayton suffered no adverse employee action as a result of her filing a charge.

14.   Plaintiff felt that something needed to be done regarding the improper behavior of the resident and when Child, Inc. Failed to take any steps to address the residents inappropriate behavior she went ahead and on June 7, 2005 and  pressed charges.

15.   On or about May 27, 2005 Plaintiff wrote a letter to her supervisors at the Governor Charles L. Terry Jr., Emergency Home for Children and Youth, Robbie MacDonna and Nicole Russo.  That letter requested, for the first time that plaintiff be permitted to work the part-time hours for which she had been hired in order that she be allowed to fulfill an prior commitment which she had undertaken prior to her employment with Child, Inc. and which Child, Inc. was aware of at the time she was hired.  Defendant never responded to the request.

16.   On or about June 3, 2005, without cause or reasonable justification Child, Inc. terminated Plaintiff's employment on an immediate basis.

## COUNT I.

## RACIAL DISCRIMINATION UNDER 1981.

16.   The averments of paragraphs 1 through 15 are incorporated be reference as if fully set forth at length.

17.   Defendant's action constitute a violation of 42 U.S.C. 1981.

WHERFORE, Plaintiff requests legal and equitable relief including:

a) injunctive relief angainst further acts of discrimination and requring Defendnat to provide employment discrimination training to its employees;

b) front pay;

c) back pay with interest;

d) compensatory damages for Plaintiff's humiliation, aniety, emotional distress, costs for therapy and medication, lost wages and benefits;

e) punitive damages;

f) attorneys fees and costs.

## COUNT II.

### BREACH OF CONTRACT

18. The averments of paragraphs 1 through 17 are incorporated be reference as is fully set forth at length.

19. Defendants breached the terms of its employment contract with Plaintiff by requiring her to regularly work more then the maximum hours per work allowed as set forth in her employment agreement and then in the first instance that Plaintiff requests that she be allowed to work only the part-time hours for which she was employed, immediately terminating her employment without cause or reasonable justification.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendant awarding Plaintiff damages arising as a result of the breach, including attorneys fees and costs and such other relief ans the Court deems just and necessary under the circumstances.

### COUNT III

## BREACH OF THE STANDARD OF GOOD FAITH AND FAIR DEALING

20. Paragraphs 1 through 19 are incorporated herein by reference.

21. Defendants discharge or termination of Ms. Hyman was a breach of the public policy of the State of Delaware and was therefore, a breach of the covenant of good faith and fair dealing implied in her employment contract.

22. As a direct and proximate result of the breach of the covenant of good faith and fair dealing implied in its contract with Ms. Hyman by defendant, Ms. Hyman has suffered, is presently suffering and will continue to suffer lost income and benefits, lost future wages, loss of professional stature, emotional pain and suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life and other pecuniary and non-pecuniary losses.

23. Defendants wrongful misconduct was malicious, reckless, willful and wanton. Defendants are therefore liable to Ms. Hyman for punitive damages

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendant awarding Plaintiff damages arising as a result of the breach, including punitive damages, attorneys fees and costs and such other relief ans the Court deems just and necessary under the circumstances

**NOLTE & ASSOCIATES**

**R. STOKES NOLTE, ESQUIRE**
ID No. 2301
Nolte & Associates
1010 N. Bancroft parkway Suite 21
Wilmington, DE 19805
(302) 777-1700
Attorney for Plaintiff

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Miriam Hyman

## DEFENDANTS
CHILD, INC.

**(b)** County of Residence of First Listed Plaintiff **Philadelphia**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant **New Castle**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number) & Stokes Nolte
Nolte Associates, 1010 N. Bancroft Pkwy, Suite 21
Wilmington, DE 19805 (302) 777-1700

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [x] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury - Med. Malpractice | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury - Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 | | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | **PERSONAL PROPERTY** | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 370 Other Fraud | [ ] 650 Airline Regs. | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | [ ] 371 Truth in Lending | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal Property Damage | [ ] 690 Other | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 385 Property Damage Product Liability | **LABOR** | [ ] 861 HIA (1395ff) | [ ] 810 Selective Service |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | | [ ] 710 Fair Labor Standards Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/Exchange |
| [ ] 195 Contract Product Liability | | | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DIWC/DIWW (405(g)) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 196 Franchise | | | [ ] 730 Labor/Mgmt. Reporting & Disclosure Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 740 Railway Labor Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence | [ ] 790 Other Labor Litigation | **FEDERAL TAX SUITS** | [ ] 892 Economic Stabilization Act |
| [ ] 220 Foreclosure | [x] 442 Employment | **Habeas Corpus:** | [ ] 791 Empl. Ret. Inc. Security Act | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 894 Energy Allocation Act |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | | | [ ] 895 Freedom of Information Act |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 540 Mandamus & Other | | | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | [ ] 550 Civil Rights | | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 440 Other Civil Rights | [ ] 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. 1981
Brief description of cause:
Wrongful Termination based on Race

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE
DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**EXHIBIT B**

## AFFIDAVIT OF ROBBIE MACDONNA HOOSTY

STATE OF DELAWARE     :
                         : SS.

COUNTY OF NEW CASTLE    :

Robbie MacDonna Hoosty, being duly sworn according to law, states as follows:

1.    I am employed by Child, Inc. and I am the director at the Governor Charles L. Terry Jr. Emergency Home for Children and Youth.

2.    I am familiar with the allegations contained in plaintiff's Complaint against Child, Inc.

3.    Plaintiff, Miriam Hyman, was hired by Child, Inc. to work as a part-time Child/Youth Service Worker at the Governor Charles L. Terry Jr. Emergency Home for Children and Youth beginning on March 23, 2005.

4.    Child, Inc. had a written anti-discrimination policy in effect during the time of plaintiff's employment.

5.    Plaintiff was hired as an "at will" employee.

6.    Child, Inc. had the right to terminate plaintiff from her work at the Governor Charles L. Terry Jr. Emergency Home for Children and Youth after 15 days notice, unless plaintiff was terminated for cause in which case she could be terminated immediately. Plaintiff was discharged on June 3, 2005. She was still within the six (6) month orientation period during which time her performance was being evaluated at the time of her discharge.

7.    Plaintiff was not terminated on the basis of race. Indeed, the current resident manager is African American and 73% of the staff is African American. The past director of Child, Inc.'s Shelter Services was African American. The current director of Child, Inc.'s Specialized Foster Care Services is African American and 80% of the foster care staff is African American. At the time of plaintiff's employment, the director of Specialized Foster Care Services was also African American.

8.    Plaintiff was terminated because she wanted to set her work schedule so that it could revolve around her own schedule as an actress. Plaintiff's proposed schedule would require the adjustment of other employees' respective schedules.

9.    Plaintiff was terminated also because she missed mandatory staff meetings. Plaintiff was informed that staff meetings were mandatory. These meetings were necessary for staff personnel at Child, Inc. to keep current with information needed to care for and provide services to Child, Inc.'s residents. Plaintiff lost out on valuable information pertaining to Child, Inc. residents, including the white minor male resident whom plaintiff improperly restrained because plaintiff missed a meeting when that individual was discussed. Plaintiff left early and missed one and one-half hours of a mandatory meeting on April 28, 2005. On May 24, 2005,

plaintiff advised Child, Inc. that she would not be able to attend future meetings because of her other job. Plaintiff missed a mandatory meeting on 5/24/05 which lasted three (3) hours.

10.    Plaintiff was terminated also because she failed to follow instructions and then agreed to instructions and then failed to follow through. For example, plaintiff failed to perform inventory tasks. Part of plaintiff's duties included transporting Child, Inc. residents to school for which tasks plaintiff was provided travel directions. Plaintiff failed to follow clear directions to the Gunning Bedford school and somehow ended up in the state of Maryland without adequate explanation. Plaintiff was given verbal directions on numerous occasions about her performance and attitude. Plaintiff was difficult to supervise. Plaintiff would not address her immediate supervisor directly. Plaintiff was extremely defensive and had a hard time listening to what supervisors had to say. Plaintiff projected her own values onto residents. For example, plaintiff was advised that a particular resident might not work through an issue in a timely manner that suited plaintiff, plaintiff wanted the resident to put his past issues aside and be able to act the way plaintiff wanted him to act because of her own past.

11.    Plaintiff was terminated because her unauthorized restraint of a minor child resident with emotional problems contravened Child, Inc. policies which were communicated to plaintiff during the employment interview process, in mandatory training and which she agreed to in writing. The minor child resident appeared terrified of plaintiff.

Plaintiff appeared to be picking on the resident by refusing to wash his clothes, which contravened Child, Inc.'s policy of requiring plaintiff and other similarly situated to wash residents' clothing, which policy was recorded in meeting minutes.

12.    The incident involving a white minor male resident and plaintiff was different than the incident involving Child, Inc. employee, Clayton, who is white, and an Hispanic minor female resident. Plaintiff desired to press charges against the white minor resident, but Child, Inc. did not want plaintiff to press those charges because plaintiff herself handled the incident inappropriately by restraining the white minor male resident in contravention of Child, Inc. policy and because the white minor male resident had emotional problems and his conduct on the date of the incident between plaintiff and him could and should have been addressed more appropriately without the use of physical restraint and contact but rather by patience and discussion between plaintiff and the white minor male resident. The white minor male resident did exhibit threatening or assaultive behavior, but simply did not wish to take his medicine.

13.    The incident involving Child, Inc. employee Clayton, a white female, and a minor Hispanic female resident, the minor resident had long standing behavioral problems which included combative and threatening behavior. During the incident in question, the Hispanic minor female resident threatened Clayton and affirmatively assaulted her. The Hispanic minor resident had been sent to Child, Inc. on a "no tolerance" basis and had previously been involved with Youth Rehabilitation Services. During the incident in question, the police were called because of the minor Hispanic female resident's behavior and it was determined that she needed to be removed from the Child, Inc. Governor Charles L. Terry, Jr. Emergency Home for Children and Youth. To do so, Ms. Clayton had to be listed as a victim on the police report and in that sense was an individual who necessarily had to "press charges" in order to secure the

removal of the minor Hispanic female resident from the Terry Shelter. Ms. Clayton dropped the charge after the client was removed from the shelter.

14.  Plaintiff pressed charges against the white male minor resident and several hearings in Family Court were scheduled. I was subpoenaed to attend and was contacted by Jennifer Fochtman of the Delaware Attorney General's office concerning the scheduling of the hearings. I attended hearings on two (2) occasions and Pat Payne, the resident manager, attended in my place on one occasion. Each time we appeared, a host of others was required to attend, some from the Murphy School in Dover, including the white minor male resident who was restrained by plaintiff. Each time we appeared, plaintiff failed to appear and plaintiff's charges against the white minor male resident were dismissed.

15.  Plaintiff never complained about the additional hours that she worked and was remunerated for them.

16.  The weekly timesheets attached to Child, Inc.'s Motion for Summary Judgment, signed by plaintiff and her supervisors, accurately reflect the actual hours worked by plaintiff and for which she was paid.


_Robbie M Shorty_


SWORN TO AND SUBSCRIBED before me this _21st_ day of September, 2007.


_Deborah Palmer - Sutter_
Notary


DEBORAH A. PALMER-SUTTER
NOTARY PUBLIC
STATE OF DELAWARE
MY COMMISSION EXPIRES
February 01, 2009

15/S27129.v1

3

**EXHIBIT C**



CHILD, INC.
507 PHILADELPHIA PIKE
WILMINGTON, DELAWARE
19809-2177
TELEPHONE (302) 762-8989
FAX: (302) 762-8983

March 22, 2005

Ms. Miriam A. Hyman
628 North 7ᵀᴴ Street
Philadelphia, PA 19123

Dear Ms. Hyman:

This is to confirm that you have been appointed to the position of part-time Child/Youth Service Worker at the Governor Charles L. Terry, Jr. Emergency Home for Children and Youth effective March 23, 2005. Ms. Nicole Russo will be your supervisor and Ms. Robin MacDonna is the Director of the Emergency Home.

Your appointment is subject to the following:

- CHILD, Inc. will obtain a service letter consistent with Chapter 7, Title 19, Section 708 of the Delaware Code from current and/or former employers who you list on the service letter.

- You attest that the information given in your application/resume and service letter represents a full and complete disclosure of your current and previous employment and that all information given in the employment application/resume is true and complete to the best of your knowledge.

- Failure to provide a full and complete disclosure of all information required is a violation of subsection (9) of Section 708 and such failure shall result in civil penalties as stated in the statute. Full and complete disclosure includes listing all current and previous employers.

- CHILD, Inc. shall receive an Adult Abuse Registry check on you.

- CHILD, Inc. shall receive a Criminal Background check on you.

- CHILD, Inc. shall receive a Drivers License check on you.

EXHIBIT
HYMAN 1

- It is agreed that I, _____ have authorized a full release for CHILD, Inc. to obtain the completed service letter, Adult Abuse Registry check, Criminal Background check, Drivers License check and Child Abuse Registry check. Further, that the Adult Abuse Registry is authorized to furnish CHILD, Inc. with any information concerning me which may be on record or otherwise, and hereby release the registry and all individuals connected therewith, including the Department of Health and Social Services from all liability for any damage that may result from the dissemination of the information.

- If information is received from any of these checks, which is contrary to information that you have presented or the Department of Services For Children, Youth and Families deems that you are unsuitable to work with children because of your criminal check, you may be terminated from employment.

- It is understood that you will be required to complete HIPAA and OSHA Training by April 15, 2005.

This shall be a part-time position. Your salary will be $10.00 per hour. You will be expected to complete time sheets stating the days and hours worked. It is understood that you will work fifteen training hours, two weeks after training is complete and then become on call back-up, to work as required, hours not to exceed 25 hours per week.

CHILD, Inc. pays its employees on the 15ᵗʰ and last day of each month. After three months, you will be eligible for direct deposit of your check into your checking or savings account. The payroll is distributed from 507 Philadelphia Pike, CHILD, Inc.'s central offices.

BOARD OF DIRECTORS: MARTHA V. du PONT, CHAIRMAN AND PRESIDENT
DIANE MALONEY du PONT, VICE PRESIDENT / LOIS S. GALINAT, TREASURER / SADIE DeJARNETTE-BRUNSON, SECRETARY
SUZANNE du PONT POSTLEWAIT / CATHERINE D. SCHLAEPPI
JOSEPH M. DELL'OLIO, EXECUTIVE VICE-PRESIDENT

Ms. Miriam A. Hyman                                          CHILD, Inc.
March 22, 2005                                               Page 2 of 2

Since this is a part-time position, you will not be eligible for benefits such as health, dental, life insurance, short/long term disability insurance, sick or vacation leave.

You will be on orientation for a six-month period when your performance will be evaluated.

It is understood that you will complete the CHILD, Inc. Basic Parent Education Program as one criterion for fulfilling orientation. You must contact Ms. Mary Michalski at (302) 762-8989 by April 15, 2005 and provide a copy of your certificate when classes are complete to Human Resources.

You are expected to attend all staff meetings and training sessions as directed by your supervisor.

It is understood that you will complete the Criminal Background check by April 15, 2005, and the Physical Examination by June 1, 2005. Continued employment is contingent on results being complete on or before the above dates.

You will be responsible for receiving, recording, counseling and assigning young people who will be coming into the emergency home. Generally, your job will be to make the youngsters feel at ease and for the maintenance of their physical and emotional well-being.

You may be tested for drugs at any time. Continued employment is contingent on negative results for the drug test.

Ms. Russo and/or Ms. MacDonna will give your assignment and work schedule to you.

You have received a copy of the job description.

CHILD, Inc. is an at-will employer.

To learn more about CHILD, Inc. please visit our website at www.childinc.com, which is updated as required.

It is understood that either party may terminate this employment arrangement between the employee and the employer after fifteen (15) calendar day's notice, unless the employee is terminated for cause.

Should you have any questions regarding the terms of employment, please bring them to our attention. If you agree to the terms of this letter, please sign where indicated and return the executed copies. A signed copy of the letter will be returned to you.

On behalf of CHILD, Inc. I welcome you aboard.

Sincerely yours,

Joseph M. Dell'Olio
Executive Vice-President

Agreed: _____
          Miriam A. Hyman

                                          3/22/05
                                          Date

JMD/clf .

Enclosures

cc:      Connie L. Futty
         Human Resources Administration

GTH PT CYSW

**EXHIBIT D**

5/27/05
Governor Terry Home
700 C River Road
Wilmington, DE 19809
Attn: Director, Robbie MacDonna and Manager, Nicole Russo

Hello ladies! It is almost production time for me and I wanted to give you both an early update. Prior to being hired at Gov. Terry I was offered a role in Merchant of Venice in Center Valley, Pa ( about 45 mins to an hour from Phila). One of the main reasons I wanted this job other then assisting troubled youth was because it would allow me to perform full time and teach during the day. At the time of hire I was told that there would be two individuals at night and that I would be doing between 6 to 8 hours a night ex. 12am-6am or 11pm-7am. I am hoping that that will soon happen because when told that I realized that I could really make these productions work. Let me get right to it. I would need to be scheduled similar to the hours above for about roughly from July 1 – Aug.6. The production runs from June 28th – Aug. 7th. We will rehearse beginning at 9:30 am in Center Valley and I would be living there during this time. So on certain days I would need to leave in the morning no later than 7am or arrive no earlier than @ 12am. It sounds confusing but I hoping this can work out because I really like this job.

On the nights of July 1, 2, 5, 6, 7, and the 11th I can come in regular time 10pm-11pm whether the full time position had been filled or not, but I would need to leave no later then 7am.
Tech rehearsal
On thee nights of I can't come in at all July 15,16,17, and 19 I am in tech rehearsal from 11am-11pm
Performance days and some crazy rehearsals
On the nights of July 3, 20, 21, 29, 30, 31, and August 2, 3, 4. I would need to come in @12am and I could leave at regular time between 7am-9am on the following morning and then no later then 10:30 am on sat and sun, which I have been doing anyway.
Also I believe there are two staff meetings somewhere in here that I would be unable to attend due to rehearsal. After those dates I am free again.

I realize this is a lot and I have two suggestions because I don't wish to leave you hanging:
1: Day shift can be 2pm-12am instead of 1pm-11pm just for that time period ( Adrianne came up with this one)

2, A second night staff could just be added like discussed and I would come in after they came on and assist and then leave before they did.

3: My hours could be reduced to about 20 hrs because of all the travel until I am finished with this show.
Whew! Please let me know what you think. I eagerly await your response. Thanks


EXHIBIT
HYMAN 5

**EXHIBIT E**

## Governor Charles L. Terry Jr., Emergency Home For Children and Youth

### SCHEDULE POLICY – Part-Time

Title:   Part-Time Child/Youth Service Worker

- The Child/Youth Service Worker will be scheduled Not to Exceed hours of 25 hours per week. This may be increased or decreased based on need, but must never exceed 35 hours per week.
- Schedules may vary from week to week.
- New schedules will be posted every two weeks, unless there are staffing issues. The Scheduling Coordinator would then provide updates about scheduling. During these times, please provide (in advance) the Scheduling Coordinator with information concerning your schedule availability.
- When unable to work the part-time work week, it will be necessary for leave of absence requests to be given to the office at least one month in advance, in accordance with CHILD, Inc. policy. The REQUEST FOR OR NOTIFICATION OF ABSENCE FORM *must* be completed, approved by the Director and submitted to the main office for approval by the Executive Vice President. This form *must* also be completed for training requests.
- If a staff member would like to request to not be scheduled certain days or times (for appointments, weddings, church services, classes, etc.), but is still able to work the part-time hours for that week, at least one month's advance notice *must* be given. Requests should be written in the appropriate format provided by the Scheduling Coordinator. These requests will be taken into strong consideration.
- Once the schedule is posted, staff members will be responsible for finding their own coverage, if unable to work the scheduled shift. Each staff member that is involved is to sign a SHIFT CHANGE REQUEST FORM. Then, the scheduling coordinator must approve changes.
- All schedule changes *must* be documented on the SHIFT TIME CHANGE FORM. Approval by the Resident Manager, and/or Director is necessary for ALL changes.
- Tardiness, leaving early and absences from your shift are *strongly prohibited*. All Offenses are documented and recorded.
- A CHILD, Inc. Weekly Time Sheet must be completed and turned into the Scheduling Coordinator at the end of each week, (every Sunday).
- The Child/Youth Service Worker will maintain a *sign-in/sign-out log*. The hours Should be tallied at the end of each day and at the end of each week. The workweek begins with Monday.
- The Child/Youth Service Worker position is an hourly position.

*I have read and received a copy of the above schedule policy. I understand that the Resident Manager and/or the Director will review this policy with me and answer any questions I may have.*

Signature: _____    Date: _3_/_22_/_05_
                   Child/Youth Service Worker

EXHIBIT

HYMAN  2

**EXHIBIT F**

Page 20

1      A.    Yes.

2      Q.    And there were times when you did work between

3    25 and 35 hours per week?

4      A.    Several times, yes.

5      Q.    And on those occasions, did you make any

6    complaints to Child Inc. about working between 25 and 35

7    hours per week?

8      A.    I spoke with them a few times actually about

9    working over the amount of hours that we discussed.

10      Q.    Who did you have these discussions with and

11    when?

12      A.    It would vary.  As I stated before, sometimes,

13    you know, Ms. Pat was available, sometimes Nicki was

14    available, sometimes Robbie was available.  And based on

15    once I received what my hours would be for that week, I

16    would take a mental note and then, you know, communicate

17    to whoever was available this is past a certain amount of

18    hours.  But they assured me that they were working

19    towards hiring and they were, in fact, interviewing other

20    individuals but that they just needed that help for right

21    now.  So I agreed to help during that time.

22      Q.    For any of the weeks -- and I think you have

23    actually supplied some time sheets?

24      A.    Yes.

1      Q.    And they showed different amounts of hours

2   worked for different weeks.  Some less than 20?

3      A.    Yes.

4      Q.    Some between 20 and 25, some between 25 and

5   35, and a few over 35, I believe?

6      A.    Yes.

7      Q.    When you worked those hours, did you work them

8   voluntarily?

9      A.    Well, for the first few weeks, I worked under

10  15 hours, only for about two to three weeks.

11     Q.    Why was that?

12     A.    That was during like the training period.

13     Q.    Okay.

14     A.    After that, I never worked under 30 hours, and

15  then it would exceed to about I think 42.5 one time was

16  the most that I worked.  Again, I agreed to work those

17  hours during that time because I was not in production at

18  that time.  And I stated, I would constantly, you know,

19  ask when there was going to be another individual brought

20  on.  They were still in the process of hiring, but that I

21  agreed to work those hours just for a short period of

22  time.  That was not supposed to be a long time period

23  when I was working those amount of hours every week.

24     Q.    You received a paystub for the hours that you

Page 22

1    worked regardless of the amount that you worked per week;

2    correct?

3         A.    Yes.

4         Q.    And you cashed those checks; correct?

5         A.    Yes.

6         Q.    I'd also like to have marked as Exhibit 3

7    a document entitled, Child Inc. Policy Regarding

8    Child/Neglect in Children's Emergency Home Care.  I'll

9    have that marked as Exhibit 3.

10   *    *    *    (Hyman Exhibit No. 3 was marked;  copy

11   attached to deposition.)

12   BY MR. CONNORS:

13        Q.    Before we begin some questions about that,

14   ma'am, I wanted to ask you, when you were interviewed for

15   this position, what acting job did you make Child Inc.

16   aware of that you had already been booked for?

17        A.    For what particular show?

18        Q.    Yes.

19        A.    The show that I did that started July the 1st,

20   with Pennsylvania Shakespeare Festival.

21        Q.    And who actually did you speak to when you

22   made them aware of this particular show that you had been

23   booked for?

24        A.    For my first interview, I spoke with Nicki and

Page 60

1    And nothing happened.  That next day I went in, they said

2    there will be two staff members there.  There were, for

3    about an hour, and then they left for the evening.  I was

4    by myself that entire night with this young man and then

5    the following night.

6           Q.    From when to when?

7           A.    I was scheduled maybe 10:00 or 11:00 o'clock

8    p.m. to about 7:00 or 8:00 the next morning.

9           Q.    For both nights?

10          A.    Yes, sir.

11          Q.    Was he, was Mr. Kelly asleep then?

12          A.    When I first got there both nights, none of

13   the kids were ever asleep when the evening shift

14   generally came on.  He was awake both times, very

15   disrespectful both times.  The next morning, I would

16   communicate to either Nicki or Robbie his behavior.

17   There were two employees there that witnessed his

18   behavior, his verbal attacks, but that was it.  They

19   would leave and I was there by myself.

20          Q.    So do you believe that you were discharged

21   only because of your intention and desire to press

22   charges?

23          A.    They didn't have any other reason.

24                 MR. NOLTE:  Objection as to form but you

Miriam Hyman

Page 61

1   can answer.

2   BY MR. CONNORS:

3       Q.   Do you have any reason to believe that race

4   played a part in their decision to terminate you?

5       A.   I do feel that race played a part.

6       Q.   What do you base that belief on?

7       A.   That a month after, there was an incident that

8   was somewhat similar in a child attacking a staff member.

9   That child was Hispanic, the employee was Caucasian.

10  They supported her in pressing charges.  She pressed

11  her charges.  She was allowed.  She decided to drop her

12  charges.  She did not lose her job, certainly wasn't

13  discharged, suspended or fired, and they removed the

14  child.  But they were supportive in that case.  I

15  have no -- I can't believe anything other because I'm

16  African-American and Scott is Caucasian.

17      Q.   The incident that you're comparing is the one

18  that involved Danielle Clayton and the Hispanic woman?

19      A.   That's correct.

20      Q.   And that happened after you were discharged?

21      A.   Yes, about a month after.  And she lightly

22  tapped this employee.  I was bitten twice and he drew

23  blood.

24      Q.   Where did you get the information that the

Page 62

1    Hispanic girl lightly tapped Danielle Clayton's arm?

2        A.    From Danielle and from other like staff

3    members.

4        Q.    Do you know who?  Who are the staff members?

5        A.    They don't reside there.  I mean they don't

6    work there anymore.

7        Q.    Who are they?

8        A.    One, her name is -- one girl's name is

9    Adrienne.  And there is a guy.  I can't recall the

10   gentleman's name.

11       Q.    Why does Adrienne no longer work there?

12       A.    She doesn't live in the state anymore.  She

13   moved.

14       Q.    Do you know the name of the Hispanic woman who

15   was involved in the Clayton incident?

16       A.    I don't recall her name.

17       Q.    Do you know why she was at the Child Inc.

18   facility?

19       A.    Troubled youth.  I don't know exactly.  They

20   didn't really give us that information for all the kids.

21   We just knew they were troubled and we may know something

22   minor like they've been in foster care their whole lives

23   or something like that.

24       Q.    Do you know the criminal or behavioral

Page 63

1    background of the Hispanic woman prior to the incident

2    involving Danielle Clayton?

3        A.    Not other than what they've told us, that

4    these kids couldn't be -- see, Governor Terry brings in

5    children that aren't -- they have like a certain level.

6    When a kid comes in, they would say, okay, Miriam, this

7    kid is a six or this kid is a five, but they can't have

8    kids that come in that reach a certain number because

9    that means they're extremely violent and they weren't

10   supposed to have us in a home with an extremely violent

11   child.  So any of the kids that were there, whatever

12   records they had, it wasn't anything that exceeded this

13   certain level.

14       Q.    Other than the incident involving Danielle

15   Clayton, do you have any other facts to base your belief

16   that you were fired because of your race?

17       A.    That's pretty much the main -- that's the main

18   reason.

19       Q.    You also included in your complaint a claim

20   for breach of contract; correct?

21       A.    Yes.

22       Q.    Is the basis for that claim the fact that you

23   worked more hours than were stated in the two documents

24   that you signed on March 22, 2005?

Page 64

1        A.    Yes, and the hours that we had discussed that

2    I was signed on to do.

3        Q.    Do you agree that you willingly worked the

4    additional hours?

5        A.    Well, I worked the additional hours but there

6    was always a "but," meaning that I will work these amount

7    of hours with the understanding that they will be getting

8    someone on very, very soon.

9        Q.    During the time that you worked the additional

10   hours, you were not engaged in acting work for pay?

11       A.    Not at that time.

12       Q.    And one of the reasons you took the job at

13   Child Inc. was to supplement your income; is that

14   correct?

15       A.    That's correct.

16       Q.    If more hours had been made available to you

17   in March, April and May, when you weren't acting at Child

18   Inc., would you have taken those hours to earn

19   supplemental income?

20       A.    There were times when they were offered and I

21   declined.

22       Q.    Why did you decline?

23       A.    I was already working 39 hours a week or 35.

24   I was working full-time hours already.

Page 75

1    work three days; work a day, have off three days, work

2    like that.

3         Q.    The times you worked, were they generally the

4    night shift?

5         A.    I only worked the night shift.

6         Q.    And that shift would have ran from when to

7    when?

8         A.    It would depend on what time they scheduled

9    me.   Maybe 9:00 p.m. to 11:00 p.m., I would come in.   I

10   would be dismissed anywhere from about 6:00 a.m. to about

11   8:00 a.m.; and then if we had a staff meeting, I would

12   have to stay longer for that staff meeting.

13        Q.    You say you were dismissed.   Would somebody

14   say you can go now or when you said dismissed, is that

15   just what the schedule said?

16        A.    No, the schedule would say you're scheduled to

17   work until 6:00.   But if nobody came in until 6:30, you

18   can't leave until someone comes in because the children

19   cannot be alone by themselves; or if I was asked to take

20   kids to school, I would be finished working once the

21   children were dropped off at school.

22        Q.    During the weeks where you worked more than 35

23   hours, do you know whether, in those weeks, you took kids

24   to school?

Page 76

1          A.    I took kids to school every week.  So whether

2     I worked 25 or 39, I would still generally be taking

3     kids to school.  Even if it was one time a week, I was

4     probably doing that at least, at least probably once a

5     week.

6          Q.    At any time during your employment at Child

7     Inc., did you go to any of your supervisors and say I

8     refuse to work more than 25 hours a week?

9          A.    I never said I would refuse to work more than

10    25 hours a week.

11         Q.    Or more than 35 hours a week?

12         A.    Not those words.  (Shaking head no.)

13         Q.    What did you say?

14         A.    I would say do we know when you are going to

15    be hiring this particular individual?  Because I am

16    working X amount of hours and I would just always refer

17    to the fact that I knew this performance was going to be

18    coming up.  Or if I had happened to miss work with

19    Philadelphia Young Playwrights, I would state I'm working

20    over the hours that we had discussed so do we know when

21    this other individual is going to be coming on?  And they

22    would just say we're still interviewing.

23         Q.    At the present time, do you have any

24    intentions of interviewing or submitting applications

Miriam Hyman

Page 77

1    for work at any non-acting related entity?

2         A.    Most definitely.  I would love to do a

3    position very similar to this one.  This was very

4    supportive of the kind of work that I do and it gave me

5    the freedom and the flexibility to do so, so not having

6    this has affected me quite a bit and I'm hoping to obtain

7    some employment.  There aren't many places out there like

8    this, so it's been very difficult.

9         Q.    Now, you were discharged in June of 2005.

10   It's now June of 2007.  Aside from the application that

11   you submitted to the Presbyterian company, did you

12   submit or seek employment anywhere else in a non-acting

13   capacity?

14        A.    Yes.

15        Q.    Where and when?

16        A.    Well, with the organization called Life

17   Entertainment.  It's a children's company where, for

18   birthday parties or special events, you dress up in

19   like a character costume.  I don't know if you are

20   familiar with like Elmo or Sesame Street characters, of

21   that nature.

22        Q.    When did you submit that application?

23        A.    Well, I was working with them for maybe, maybe

24   like a year, but it's not consistent.  It's just they

**EXHIBIT G**

## CHILD, INC. POLICY REGARDING
## CHILD ABUSE/NEGLECT IN CHILDREN'S EMERGENCY HOME CARE

1. ALL CHILD, Inc. Shelter staff, volunteers and interns are required to read the Delaware Child Abuse Law (16 DE.C., Chapter 9, Sections 901 through 909) prior to beginning employment or field placement.

2. Shelter staff, volunteers and interns shall be required to report any incident or suspicion of abuse or neglect to the Director of CHILD, Inc.'s Children's Emergency Home Services Program and/or the Executive Vice-President of CHILD, Inc. Failure to report may result in termination of employment.

   In addition, the staff, volunteers and interns failing to report may be subject to legal prosecution.

3. The allegation of abuse or neglect by a member of the staff, volunteers or interns shall be reported to the Division of Family Services (DFS), Licensing Unit and Child Abuse Hotline.

4. The Executive Vice-President or his designee shall conduct an investigation by interviewing parties concerned, reading incident reports and then, determine what action shall be taken. Pending the outcome of the investigation, staff, volunteers or interns will not have contact with the alleged victim or other children in care.

5. If the allegation of abuse or neglect is confirmed by DFS, and the Executive Vice-President believes that all parties involved (alleged victim/alleged abuser) have been treated fairly and all factors have been taken into consideration in conducting the investigation, the alleged abuser shall be suspended from employment or internship or volunteer provider without pay until the matter is resolved.

6. In the event that the Executive Vice-President believes that the alleged abuser has not been fairly treated, and that person appeals the DFS report, then that person will not be suspended from employment without pay, will be closely supervised and not be alone with children in the program until all avenues of appeal have been exhausted. Worked alone on   5/26/05 & 5/30/05

7. If all avenues of appeal have been exhausted and the finding of abuse or neglect is upheld, the person will be suspended from employment, internship, or volunteerism.

8. The Executive Vice-President shall notify the President and Vice-President (also CHILD, Inc.'s legal counsel) of the Board of Directors and any action taken requiring suspension and/or termination of employment / internship/ volunteerism or appeal. Law enforcement may be notified if deemed appropriate.

_____          3/22/05
**Signature**                          **Date**

**EXHIBIT**
HYMAN 3

---

Corporal Punishment: Any staff member practicing corporal punishment with any Children in care will be immediately discharged from the employ of CHILD, Inc. Corporal punishment is considered an act of misconduct please read CHILD, Inc. Procedures and Policies for Personnel Termination of Employment (HH) page 16, and (CHILD, Inc.) Policy Manual for Specialized Foster Care.

WD-CF/Emp-GTH Abuse Policy

**EXHIBIT H**

LEXSEE 1992 DEL. SUPER. LEXIS 454



Positive
As of: Sep 20, 2007

**Barbara Peterson v. Beebe Medical Center, Inc.**

**C. A. No. 91C-07-147**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1992 Del. Super. LEXIS 454; 8 I.E.R. Cas. (BNA) 10*

August 26, 1992, Submitted
November 13, 1992, Decided

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant employer filed a motion for summary judgment before the Superior Court of Delaware, New Castle, and argued that there were no material facts at issue regarding plaintiff employee's breach of employment contract action.

**OVERVIEW:** The employer terminated the employee's employment, and the employee subsequently filed a breach of employment contract action against the employer. The employee alleged that the employer breached the parties' employment contract and that the employer breached the implied covenant of good faith and fair dealing that was implied in employment relationships. The employer filed a motion for summary judgment. The employee argued that her conversation with the chief administrator, the letter of hire he sent to her, and the employee handbook and manual created an employment contract. However, the court found that the handbook did not expressly grant the employee a specific term of employment, nor did it expressly limit the employer's right to terminate. Furthermore, the employee could not produce the letter of hire. Finally, the court found that the employee failed to sufficiently allege conduct that would have arisen to the level of a breach of good faith. Therefore, the employer's motion for summary judgment was granted.

**OUTCOME:** Defendant employer's motion for summary judgment was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN1] Summary judgment may not be granted unless there are no material issues of fact, and the moving party is entitled to judgment as a matter of law. Del. Super. Ct. Civ. R. 56(c). In determining whether there are material issues of fact, the court must consider the facts in the light most favorable to the nonmoving party.

*Contracts Law > Formation > Execution*
*Contracts Law > Statutes of Frauds > Requirements > Performance*
*Contracts Law > Statutes of Frauds > Requirements > Signatures*
[HN2] The Statute of Frauds provides that no action shall be brought upon any agreement that is not to be performed within the space of one year unless the contract is reduced to writing, or some memorandum, or notes thereof, which are signed by the party to be charged therewith. *Del. Code Ann. tit. 6, § 2714(a).*

*Contracts Law > Statutes of Frauds > Requirements > Performance*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Statutes of Frauds*
[HN3] The Delaware Statute of Frauds requirement applies to employment contracts that cannot possibly be performed within one year. Thus, if an employment contract may be performed in one year, the statute is inapplicable.

Case 1:06-cv-00227-SLR    Document 20-2    Filed 09/21/2007    Page 35 of 57

Page 2

1992 Del. Super. LEXIS 454, *; 8 I.E.R. Cas. (BNA) 10

*Labor & Employment Law > Employment Relationships > At-Will Employment > Duration of Employment*
[HN4] An at will employment relationship is subject to termination with or without cause. In order to alter this relationship, plaintiff must overcome the heavy presumption that a contract of employment, unless otherwise expressly stated, is at-will in nature, with duration indefinite.

*Labor & Employment Law > Employment Relationships > At-Will Employment > General Overview*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > General Overview*
[HN5] An employer's oral statements to a prospective employee concerning the conditions of his employment are not enforceable against the employer without some basic contract consideration.

*Labor & Employment Law > Employment Relationships > At-Will Employment > Duration of Employment*
[HN6] As a matter of law the use of the word "permanent" in an employee handbook does not mean that plaintiff is a lifetime employee with dismissal only for cause but rather that any reference to permanent employment denotes a relationship that is indefinite and therefore terminable at will by either the employer or employee.

*Labor & Employment Law > Employment Relationships > At-Will Employment > General Overview*
[HN7] Issuance of an employee handbook, standing alone, is insufficient to alter the at will status of an employee. An employee handbook will not change an employee's at-will status unless there is clear language placing express limits on the employer's right to discharge.

*Contracts Law > Consideration > Enforcement of Promises > General Overview*
*Contracts Law > Consideration > Promissory Estoppel*
*Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof*
[HN8] In order to state a claim for promissory estoppel, plaintiff must allege (i) the making of a promise; (ii) with the intent to induce action or forbearance based on the promise; (iii) reliance; and (iv) injury. The party asserting an estoppel has the burden of proving it by clear and convincing evidence. As to the promise requirement,

there must be an actual promise or definite assurance, and promissory form is required unless there is evidence of falsity or fraud.

*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Employment Relationships > General Overview*
[HN9] The implied covenant of good faith and fair dealing is a part of every employment agreement made under the laws of this state. The cause of action for breach of implied requires employer conduct amounting to fraud, deceit or a misrepresentation. An employer acts in bad faith when it induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract.

**COUNSEL:** [*1] Francis S. Babiarz, Esquire, Victor F. Battaglia, Esquire, Biggs & Battaglia, 1800 Mellon Bank Center, P.O. Box 1489, Wilmington, DE 19899.

Richard F. Stokes, Esquire, Tunnell & Raysor, Race and Pine Sts., P.O. Box 151, Georgetown, DE 19947.

**JUDGES:** DEL PESCO

**OPINION BY:** SUSAN C. DEL PESCO

**OPINION**

Plaintiff Barbara Peterson claims that she and defendant Beebe Medical Center were parties to an employment contract, which defendant allegedly breached by firing her. Plaintiff also claims that by the same action, defendant breached the implied covenant of good faith and fair dealing that is implied in employment relationships. Defendant has moved for summary judgment on both claims. This is the Court's decision that motion.

STANDARD OF REVIEW

[HN1] Summary judgment may not be granted unless there are no material issues of fact, and the moving party is entitled to judgment as a matter of law. Superior Court Civil Rule 56(c); *Moore v. Sizemore, Del. Supr., 405 A.2d 679, 680-81 (1979).* In determining whether there are material issues of fact, the court must consider the facts in the light most favorable to the nonmoving party. *Merrill v. Crothall-American, Inc., Del. Supr., 606 A.2d 96, 99 (1992).* [*2]

FACTS

Talking all inferences in favor of plaintiff, the relevant facts are as follows.

Case 1:06-cv-00227-SLR    Document 20-2    Filed 09/21/2007    Page 36 of 57

Page 3

1992 Del. Super. LEXIS 454, *; 8 I.E.R. Cas. (BNA) 10

Plaintiff was the Director of Beebe Medical Center's School of Nursing from 1970 until September 7, 1989. She was not employed pursuant to a written contract.

Plaintiff testified that when she was originally hired, the Chief Administrator of Beebe at the time told her, *inter alia,* "we trust you will be here until you retire." Plaintiff testified that in response to this offer, she requested a letter of hire. Allegedly, plaintiff received such a letter. Plaintiff has not produced the letter, nor does she remember what the letter said.

During plaintiff's employment, defendant issued an employee handbook which discussed discipline and termination procedures. All of the listed grounds for such action are related to performance. A later compilation of personnel policies contained similar provisions. Plaintiff suggests that the handbook and personnel policies imply a contractual restriction on defendant's right to terminate plaintiff's employment except for reasons related to performance, i.e., "for cause." In further support of this claim, plaintiff offers a letter, apparently from defendant's [*3] personnel department, stating that she had "Full-Time, Permanent Employment." The letter is not signed.

Plaintiff testified that during her years at Beebe, she did not know of anyone who was fired without cause. However, Beebe's employment records indicate that two individuals with significant management responsibilities have been discharged for "lack of confidence", the same reason given for plaintiff's termination.

Plaintiff also claims that during her employment she rejected other job offers because she believed that defendant was contractually bound not to fire her without cause. However, plaintiff also testified that she remained free to accept other employment during her entire tenure with defendant.

In 1987, Beebe hired James Ball as its new Chief Administrator. Early in the summer of 1989, he proposed a reorganization of Beebe and suggested that plaintiff, as part of his management team, review the changes. Concerned that the accreditation of the nursing school would be lost and that the change would violate the rules of the Board of Nursing of the State of Delaware, plaintiff voiced her concerns to Mr. Ball. Consequently Mr. Ball had an associate, Kris Powell, contact [*4] the accrediting body, the National League for Nursing (NLN). The secretary of the NLN, Marilyn Burkhart, apparently told Powell that the proposed reorganization did not violate accreditation standards. Plaintiff's own phone call to Ms. Burkhart confirmed this conclusion. Mr. Ball decided to go ahead with the reorganization.

Despite her knowledge that Mr. Ball had begun to implement the changes, and that he expected her to sup-

port the move, plaintiff helped prepare a report outlining potential problems with the reorganization. Plaintiff sent a copy of the report to Mr. Ball. The report was critical of the proposed reorganization. On September 7, 1989, plaintiff was terminated.

I

The first issue is whether plaintiff's contract claim is barred by the Statute of Frauds, *6 Del. C. § 2714.*

[HN2] The Statute of Frauds provides that "no action shall be brought . . . upon any agreement that is not to be performed within the space of one year . . . unless the contract is reduced to writing, or some memorandum, or notes thereof, [which] are signed by the party to be charged therewith . . . ." *6 Del. C. § 2714(a).*

A prefatory issue is whether the statute is applicable to this case. The words "not [*5] to be performed within the space of one year" have been held to mean "which could not possibly be performed within the space of one year." *Brandner v. Delaware State Housing Auth., Del. Ch., 605 A.2d 1, 1 (1991),* citing *Haveg Corp. v. Guyer, Del. Supr., 58 Del. 535, 211 A.2d 910 (1965).* Correspondingly, in the context of employment contracts, it has been stated that [HN3] "the Delaware Statute of Frauds requirement applies to employment contracts that cannot possibly be performed within one year." *Kirschling v. Lake Forest School Dist., D.Del., 687 F. Supp. 927, 930 (1988),* citing *Haveg Corp. v. Guyer, 58 Del. 535, 211 A.2d 910, 912-13 (1965).* Thus, if an employment contract may be performed in one year, the statute is inapplicable. *See Brandner, 605 A.2d at 1.*

In *Brandner,* the plaintiff alleged that she was employed pursuant to an oral contract which bound the employer not to terminate her without good cause. The alleged contract was of indefinite duration. The employer moved to dismiss, asserting the Statute of Frauds as a defense. The Court denied the [*6] motion and held that since such a contract is capable of completion within one year, it is not within the ambit of the Statute of Frauds. *Brandner, 605 A.2d at 3.* The facts of the instant case are the same as those in *Brandner* for purposes of analysis under the Statute of Frauds: plaintiff alleges an oral contract of employment for an indefinite period. Thus, the Statute of Frauds is inapplicable to this case

II

The next issue is whether the contract of employment between plaintiff and defendant was terminable without cause.

Under well settled Delaware law, [HN4] an at will employment relationship is subject to termination with or without cause. *Heideck v. Kent General Hospital, Del. Supr., 446 A.2d 1095 (1982); Gaines v. Wilmington Trust*

Case 1:06-cv-00227-SLR    Document 20-2    Filed 09/21/2007    Page 37 of 57

Page 4

1992 Del. Super. LEXIS 454, *; 8 I.E.R. Cas. (BNA) 10

*Company, 1991 Del. Super. LEXIS 207*, Del Pesco, J. (June 3, 1991). In order to alter this relationship, plaintiff must overcome the "heavy presumption that a contract of employment, unless otherwise expressly stated, is at-will in nature, with duration indefinite." *Merrill, 606 A.2d at 102.*

Plaintiff claims that her conversation with Mr. Larsen, [*7] the letter of hire he sent to her, the verification letter sent several years' later, the employee handbook and manual, and the course of conduct between the parties created an employment contract, under which she could not be fired without cause. Plaintiff's arguments will be addressed seriatim.

The conversation between Mr. Larsen and plaintiff did not create an enforceable oral contract. Plaintiff's recollection was that Mr. Larsen said, *inter alia*, "we trust you will be here until you retire." Such words are not sufficient to create enforceable contractual obligations. *See Avallone v. Wilmington Medical Center, Inc., D.Del., 553 F. Supp. 931, 936 (1982).* "[HN5] An employer's . . . oral statements to a prospective employee concerning the conditions of his employment are not enforceable against the employer without some basic contract consideration . . . ." *Asher v. A. I. duPont Institute of the Nemours Foundation*, Del. Super., C. A. No. 84C-JL-71, Martin, J. (June 19, 1987), at 4-5, citing 9 Williston on Contracts, § 1017 pps. 131-135 (3d ed.). Plaintiff makes no claim that at the time of hire there was consideration for defendant's alleged promise [*8] of lifetime employment.

The alleged letter of hire is of no import, since plaintiff cannot recall whether the letter stated any terms of employment.

The verification letter and its use of the word "permanent" are also insignificant. There is authority "which supports the proposition that [HN6] as a matter of law the use of the word 'permanent' in an employee handbook does not mean that plaintiff is a lifetime employee with dismissal only for cause but rather that any reference to permanent employment denotes a relationship that is indefinite and therefore terminable at will by either the employer or employee." *Asher, supra*, at 4; *See also Winnie Mann and Gloria Daniels v. Cargill Poultry, Inc., 1990 Del. Super. LEXIS 225*, Graves, J. (June 13, 1990), at 14. The letter sent to plaintiff may be similarly classified.

The focus of the inquiry next turns to the handbook. [HN7] Issuance of an employee handbook, standing alone, is insufficient to alter the at will status of an employee. *Asher, supra*, at 3, citing *Heideck v. Kent General Hosp., Inc., Del. Supr., 446 A.2d 1095 (1982), Avallone v. Wilmington Medical Center, Inc., D.Del., 553 F. Supp. 931 (1982)*, [*9] and *Emory v. Nanticoke Homes,*

*Inc.*, Del. Super., C. A. No. 82C-MR-14, Ridgely, J. (July 19, 1985). Indeed, it has been held that "an employee handbook will not change an employee's at-will status unless there is clear language placing express limits on the employer's right to discharge." *Gaines, supra*, at 4. See also *Heideck, 446 A.2d at 1097* ("The [handbook] does not grant to any employee a specific term of employment and does not, therefore, alter plaintiffs 'at will' employment status."); *Mann, supra*, at 14-15 (a claim of employment based on a policy statement "must be more than an inference of a fixed term; it must be an explicit statement of a fixed term.")(citations omitted); *Cf. Mary A. Crisco v. Bd. of Educ. of the Indian River School Dist.*, Del. Ch., C. A. No. 9282, Berger, V.C. (Aug. 29, 1988).

The handbook at issue did not expressly grant plaintiff a specific term of employment, nor did it expressly limit the employer's right to terminate. In the absence of such language, and in the presence of a "heavy presumption that a contract of employment, unless otherwise expressly stated, is at-will in nature", *Merrill, 606 A.2d at 102*, [*10] the Court holds that the handbook did not alter plaintiff's at will employment status.

Plaintiff cites *L. H. Doane Associates, Inc. v. A. Barry Seymour*, Del. Supr., No. 172, 1984, Horsey, J. (April 23, 1985)(ORDER) in support of her claim that she was employed pursuant to a contract that had implied in it a provision that she could be discharged only for just cause. *Doane* held that an agreement to change the terms of compensation, e.g., to pay for overtime, could be implied from a course of dealing between the parties. *Doane, supra*, at 4.

In *Doane*, the employee-plaintiff had been a partner in the employer-defendant company and, under the parties' original contract, received a fixed salary regardless of the number of hours he worked. Later, the employer changed its policy by paying the employee overtime. The Doane Court held that the employer's course of conduct provided sufficient evidence to support a modification of the original contract. Doane, supra, at 4. Doane is distinguishable since, in the instant case, there is no "course of conduct" which demonstrates a modification of plaintiff's at will employment status. Defendant did accommodate plaintiff when she [*11] had other job opportunities, but that conduct merely reaffirms the at will nature of the relationship by recognizing that she was free to leave if her requirements were not met.

The last argument in support of the contract claim is that plaintiff relied on Mr. Larsen's alleged statement about lifetime employment, on defendant's alleged policy of terminating employees only for cause, and on the handbook's alleged expression of that policy.

Case 1:06-cv-00227-SLR    Document 20-2    Filed 09/21/2007    Page 38 of 57

Page 5

1992 Del. Super. LEXIS 454, *; 8 I.E.R. Cas. (BNA) 10

Plaintiff fails to discuss the legal significance of these alleged facts. Apparently, plaintiff claims that she detrimentally relied on Mr. Larsen's statement and defendant's termination policies, and therefore defendant should be estopped from arguing that it was not contractually bound to terminate her only for cause. This is, in effect, a claim of promissory estoppel.

[HN8] "In order to state a claim for promissory estoppel, plaintiff must allege (i) the making of a promise; (ii) with the intent to induce action or forbearance based on the promise; (iii) reliance; and (iv) injury." *Rabkin v. Philip A. Hunt Chemical Corp., Del. Ch., 480 A.2d 655, 661 (1984)*, citing *Scott-Douglas Corp. v. Greyhound Corp. Del. Super., 304 A.2d 309, 319 (1973)*. [*12] "The party asserting an estoppel has the burden of proving it by clear and convincing evidence." *Reeder v. Sanford School, Inc., Del. Super., 397 A.2d 139, 141 (1979)*.

As to the promise requirement, there must be an actual promise or definite assurance, and promissory form is required unless there is evidence of falsity or fraud. *Reeder, 397 A.2d at 141; See also Metropolitan Convoy Corp. v. Chrysler Corp., Del. Supr., 58 Del. 286, 208 A.2d 519, 521 (1965)*.

It is clear from the record that no statement was made by defendant sufficient to meet the promise requirement. In light of plaintiff's own characterization of the conversation between herself and Mr. Larsen, the evidence "falls short of establishing a real promise on the part of [defendant] upon which [plaintiff] was entitled to rely." *Metropolitan, 208 A.2d at 521*. In light of this conclusion, it is not necessary to discuss the other elements of plaintiff's estoppel claim.

Defendant's motion for summary judgment on the contract claim is GRANTED.

III

The last issue is whether the circumstances of plaintiff's termination [*13] amounted to a breach of the implied covenant of good faith and fair dealing.

[HN9] The implied covenant of good faith and fair dealing was recently recognized as being a part of every employment agreement made under the laws of this state. *Merrill, 606 A.2d at 101*. The cause of action for breach of implied covenants recognized in Merrill requires employer conduct amounting to fraud, deceit or a misrepresentation. "An employer acts in bad faith when it induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract." *Merrill, 606 A.2d at 101*. In this case, there are no allegations of such conduct, nor, apparently, any facts to support any such allegations. Plaintiff argues that the Merrill Court intended its holding to apply to cases other than those involving fraudulent conduct by the employer. This assertion is not supported by the language of *Merrill*, which is expressly limited to cases involving intentionally deceptive words or action on the part of the employer.

Therefore, defendant's motion for summary [*14] judgment on this claim is GRANTED.

IT IS SO ORDERED

Susan C. Del Pesco

LEXSEE 1993 DEL. LEXIS 142



Analysis
As of: Sep 20, 2007

BARBARA PETERSON, Plaintiff Below, Appellant, v. BEEBE MEDICAL
CENTER, INC., a Delaware Corporation, Defendant Below, Appellee.

No. 565, 1992

SUPREME COURT OF DELAWARE

*1993 Del. LEXIS 142*; *10 I.E.R. Cas. (BNA) 788*

February 19, 1993, Submitted
March 24, 1993, Decided

**SUBSEQUENT HISTORY:**    [*1]  Mandate Issued
April 12, 1993. Released for Publication April 13, 1993.

**PRIOR HISTORY:**    Court Below: Superior Court of
the State of Delaware in and for New Castle County.
C.A. No. 91C-07-147

**DISPOSITION:**    AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a wrongful termination
action, plaintiff employee appealed from a judgment of
the Superior Court of the State of Delaware in and for
New Castle County in favor of defendant employer. The
employee contended that his employment was permanent
and that the employer breached an implied covenant of
good faith and fair dealing.

**OVERVIEW:** The employee contended that the em-
ployer told her that she would remain employed with the
employer until she retired; that she was classified as full
time permanent; that the employee handbook did not
expressly reserve the right to terminate without cause;
and the employer encouraged the employee to remain
after she was offered other employment. The court af-
firmed the judgment, held that the presumption of at-will
employment was heavy, and that the employee did not
allege any facts to support the elements for a breach of
the implied covenant of good faith and fair dealing.

**OUTCOME:** The court affirmed the judgment dismiss-
ing the employee's wrongful termination action.

**LexisNexis(R) Headnotes**

*Labor & Employment Law > Employment Relation-
ships > At-Will Employment > Duration of Employ-
ment*
[HN1] An at-will employment relationship is subject to
termination with or without cause.

*Labor & Employment Law > Employment Relation-
ships > At-Will Employment > General Overview*
[HN2] Absent bad faith, an employer has the freedom to
terminate an at-will employment relationship for its own
legitimate business, or even highly subjective, reasons.
The presumption in favor of at-will employment is a
heavy one.

*Contracts Law > Types of Contracts > Covenants
Labor & Employment Law > Employment Relation-
ships > General Overview*
[HN3] An implied covenant of good faith and fair deal-
ing is part of employment contracts.

**JUDGES:** Before HORSEY, MOORE and WALSH,
Justices.

**OPINION BY:** BY THE COURT; A. G. T. MOORE, II

**OPINION**

ORDER

This 24th day of March, 1993, it appearing that:

1) Pursuant to Supreme Court Rule 25(a), the defendant-appellee, Beebe Medical Center, Inc. ("Beebe"), has moved to summarily affirm the Superior Court's grant of summary judgment in favor of Beebe on the ground that Delaware law clearly controls the issues on appeal. We agree and affirm.

2) The plaintiff-appellant, Barbara Peterson ("Peterson") was the Director of Beebe Medical Center's School of Nursing from August 1970 until she was fired in September 1989. Peterson claimed that the termination breached an alleged oral employment contract, and violated the covenant of good faith and fair dealing, which is implied in all employment relationships. The trial court determined that the employment relationship was at-will and that Beebe had not violated the covenant of good faith and fair dealing. Consequently, [*2] the trial court granted summary judgment in favor of Beebe.

3) On appeal, Peterson asserts that genuine issues of material fact exist concerning allegations of the breach of the employment contract and the violation of the covenant of good faith and fair dealing.

4) Our review of the trial court's grant of summary judgment to the defendant is *de novo. See Gilbert v. El Paso Co., Del. Supr., 575 A.2d 1131, 1141 (1990).* Summary judgment is appropriate if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. SUPER. CT. CIV. R. 56(c); *Moore v. Sizemore, Del. Supr., 405 A.2d 679, 680-81 (1979).* In determining materiality we consider the facts in the light most favorable to the nonmoving party. *Merrill v. Crothall-American, Inc., Del. Supr., 606 A.2d 96, 99-100 (1992).* We examine the legal issues to determine whether the trial court "erred in formulating or applying legal precepts." *Gilbert, 575 A.2d at 1142.*

5) When viewed most favorably to Peterson, the facts are as follows:

a) The Chief Administrator of Beebe [*3] told Peterson at the time she was hired that, *inter alia,* "we trust you will be here until you retire." Peterson also claimed Beebe sent her a letter of hire, but she could not produce it nor could she recall whether it stated any terms of employment.

b) A document in Beebe's personnel records classified Peterson's employment as "Full Time, Permanent."

c) During Peterson's employment, Beebe issued an employee handbook which discussed discipline and termination procedures in the context of job performance, but did not expressly reserve the right to terminate without cause.

d) Beebe made accommodations to encourage Peterson to remain at Beebe after she was offered other employment.

e) Peterson was unaware of any discharges made by Beebe without cause while she was employed. However, Beebe's employment records indicate that two individuals with significant management responsibilities were discharged for "lack of confidence," the same reason given for plaintiff's termination.

6) Under well settled Delaware law, [HN1] an at-will employment relationship is subject to termination with or without cause. *Heideck v. Kent General Hospital, Inc., Del. Supr., 446 A.2d 1095, 1096 (1982);* [*4] *Gaines v. Wilmington Trust Company,* Del. Super., C.A. No. 90C-MR-135, Del Pesco, J. (June 3, 1991), *aff'd on other grounds,* Del. Supr., No. 250, 1991, Hartnett, V.C. (December 27, 1991) (ORDER); *Emory v. Nanticoke Homes, Inc.,* Del. Super., C.A. No. 82C-MR-14, Ridgely, J. (July 19, 1985) (OPINION). This means that [HN2] absent bad faith, an employer has the freedom to terminate an at-will employment relationship for its own legitimate business, or even highly subjective, reasons. *Merrill v. Crothall-American, Inc., Del. Supr., 606 A.2d 96, 102 (1992).* The presumption in favor of at-will employment is a heavy one. *Id.*

7) Regarding Peterson's employment contract claim, she asserts that the trial court erred by analyzing the facts independently, rather than assessing them in an aggregate fashion. Peterson bases this claim on the trial court's statement that "Plaintiff's arguments will be addressed seriatim." The trial court addressed the legal significance of the facts given in the same order listed above.

8) After carefully reviewing the record, we conclude that Peterson's contention regarding the employment contract is without merit. It is [*5] incorrect to assume that the trial court dropped the factual context of the case by sequentially addressing their legal significance. The trial court simply used a logical process of legal reasoning to apply pertinent legal principles to the facts implicated by the appellant's arguments. Nothing in the opinion below indicates that the trial court reached its conclusion on an *ad hoc* basis as suggested by the appellant. Whether considered individually or collectively, no genuine issues of material fact exist, and the legal issues presented on appeal are clearly controlled by Delaware law. The trial court committed no error.

9) Peterson's claim of a breach of the implied covenant of good faith and fair dealing is similarly without merit. We recognize [HN3] an implied covenant of good faith and fair dealing as being part of employment contracts. *Merrill v. Crothall-American, Inc., Del. Supr., 606 A.2d 96, 101 (1992).* Such a claim requires some aspect of fraud, deceit, or misrepresentation. *Id.* "An em-

1993 Del. LEXIS 142, *; 10 I.E.R. Cas. (BNA) 788

ployer acts in bad faith when it induces another to enter into an employment contract through actions, words, or the withholding of information, which is [*6] intentionally deceptive in some way material to the contract." *Id.* The trial court correctly concluded that Peterson alleged no facts that tended to support the conclusion that a material issue existed as to one or more of the elements for recovery for breach of the implied covenant. We therefore conclude that the trial court committed no error.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be, and the same hereby is,

AFFIRMED.

BY THE COURT:

A. G. T. Moore, II, Justice

**EXHIBIT I**

CHILD, Inc. - WEEKLY TIME SHEET

For ALL Hourly Workers – Including Support/Back-Up Time @ Shelters

Employee Name: _Miriam Hymen_

Department: __GTH / L00__

For Week Ending: (Sunday's Date) - _3/27/05_

Supervisor: __Nicki Russo / Robbie MacDonna__

| DATE | Day of Week | Morning (AM) In | Out | Afternoon (PM) In | Out | Additional Hours In | Out | Total Hours | FOR NOTES and/or OFFICE USE ONLY |
|------|-------------|-----------------|-----|-------------------|-----|---------------------|-----|-------------|----------------------------------|
|  | Monday |  |  |  |  |  |  |  |  |
|  | Tuesday |  |  |  |  |  |  |  |  |
| 3/23/05 | Wednesday | 9 AM | 12 PM |  | 12 pm |  |  | 3 |  |
|  | Thursday |  |  |  |  |  |  |  |  |
| 3/25/05 | Friday |  |  | 11 pm | 8 AM |  |  | 9 |  |
|  | Saturday |  |  |  |  |  |  |  |  |
|  | Sunday |  |  |  |  |  |  |  |  |
|  | TOTALS: |  |  |  |  |  |  | 12 |  |

NOTE: Time Sheet MUST be completely filled out, hours calculated, signed by employee and completed with Authorization Signature

_____
Employee Signature

_Nicki Russo_
Supervisor Authorization Signature

_Robbie MacDonna_
Director's Signature

Payroll Notes: _____

TS Form
Revised: 06/10/04

# CHILD, Inc. - WEEKLY TIME SHEET

For ALL Hourly Workers – Including Support/Back-Up Time @ Shelters

**Employee Name:** Miriam Hyman

**Department:** GTH / L00

**For Week Ending: (Sunday's Date) -** 4/3/05    APR 1 5 /05

**Supervisor:** Nicki Russo / Robbie MacDonna

| DATE | Day of Week | Morning (AM) In | Morning (AM) Out | Afternoon (PM) In | Afternoon (PM) Out | Additional Hours In | Additional Hours Out | Total Hours | FOR NOTES and/or OFFICE USE ONLY |
|---|---|---|---|---|---|---|---|---|---|
| 3/28/05 | Monday | 11pm | 9 AM | | | 9 AM | 12 pm | 13 | staff meeting |
| 3/29/05 | Tuesday | | | | | | | | |
| 3/30/05 | Wednesday | 10pm | 8 AM | | | | | 10 | |
| 3/31/05 | Thursday | 10pm | 8 AM | | | | | 10 | T = 45 |
| | Friday | | | | | | | | |
| | Saturday | | | | | | | | |
| | Sunday | | | | | | | | |
| | **TOTALS:** | | | | | | | 33 | |

**NOTE: Time Sheet MUST be completely filled out, hours calculated, signed by employee and completed with Authorization Signature**

_____
**Employee Signature**

Nicole Russo
**Supervisor Authorization Signature**

_____
**Director's Signature**

**Payroll Notes:**

APR 1 5

TS Form
Revised: 06/10/04

CHILD, Inc. - WEEKLY TIME SHEET

For ALL Hourly Workers – Including Support/Back-Up Time @ Shelters

Employee Name: Miriam Hyman

Department: GTH / L00

For Week Ending: (Sunday's Date) - 4/10/05

Supervisor: Nicki Russo / Robbie MacDonna

| DATE | Day of Week | Morning (AM) In | Morning (AM) Out | Afternoon (PM) In | Afternoon (PM) Out | Additional Hours In | Additional Hours Out | Total Hours | FOR NOTES and/or OFFICE USE ONLY |
|---|---|---|---|---|---|---|---|---|---|
| | Monday | | | | | | | | |
| | Tuesday | | | | | | | | |
| | Wednesday | | | | | | | | |
| | Thursday | | | | | | | | |
| 4/8/05 | Friday | 9pm | 8:30AM | | | | | 11.5 | |
| 4/9/05 | Saturday | 10:30p | 9:30A | | | | | 11 | |
| 4/10/05 | Sunday | 10:00pm | 7:00A | | | | | 9 | |
| | TOTALS: | | | | | | | 31.5 | |

NOTE: Time Sheet MUST be completely filled out, hours calculated, signed by employee and completed with Authorization Signature

_Employee Signature_

_Nicki Russo_
Supervisor Authorization Signature

_Robbie MacDonna_
Director's Signature

Payroll Notes:

TS Form
Revised: 06/10/04

# CHILD, Inc. - WEEKLY TIME SHEET

### For ALL Hourly Workers – Including Support/Back-Up Time @ Shelters

Employee Name: Miriam Hymon

Department: GTH / L00

For Week Ending: (Sunday's Date) - 4/17/05

Supervisor: Nicki Russo / Robbie MacDonna

| DATE | Day of Week | Morning (AM) In | Morning (AM) Out | Afternoon (PM) In | Afternoon (PM) Out | Additional Hours In | Additional Hours Out | Total Hours | FOR NOTES and/or OFFICE USE ONLY |
|---|---|---|---|---|---|---|---|---|---|
| 4/11/05 | Monday | | | | | | | | |
| 4/12/05 | Tuesday | 10pm | 8 AM | | | 9pm | 12pm | 13 mn 00 | Staff meeting |
| 4/13/05 | Wednesday | 10 pm | 8AM | | | 9AM | 8AM | 10 00 | |
| 4/14/05 | Thursday | 10pm | 8AM | | | 1 AM | 12 pm | 11 00 | staff meeting |
| 4/15/05 | Friday | | | | | | | | T = 60 1/2 |
| | Saturday | | | | | | | | |
| | Sunday | | | | | | | | |
| | TOTALS: | | | | | | | 33 00 | |

NOTE: Time Sheet MUST be completely filled out, hours calculated, signed by employee and completed with Authorization Signature

_____
Employee Signature

Nicki Russo
Supervisor Authorization Signature

_____
Director's Signature

Payroll Notes:

TS Form
Revised: 06/10/04

## CHILD, Inc. - WEEKLY TIME SHEET

For ALL Hourly Workers – Including Support/Back-Up Time @ Shelters

Employee Name: Miriam Hymon

For Week Ending: (Sunday's Date) - 4/24/05

Department: GTH / L00

Supervisor: Nicki Russo / Robbie MacDonna

| DATE | Day of Week | Morning (AM) In | Morning (AM) Out | Afternoon (PM) In | Afternoon (PM) Out | Additional Hours In | Additional Hours Out | Total Hours | FOR NOTES and/or OFFICE USE ONLY |
|------|-------------|-----------------|------------------|-------------------|--------------------|--------------------|--------------------|-------------|----------------------------------|
| 4/18/05 | Monday | 11pm | 7am | | | | | 8   00 | |
| 4/19/05 | Tuesday | | | | | | | | |
| 4/20/05 | Wednesday | | | | | | | | |
| 4/21/05 | Thursday | | | | | | | | |
| 4/22/05 | Friday | 11pm | 10:30a | | | | | 11½  50 | |
| 4/23/05 | Saturday | 10:30p | 9:30a | | | | | 11   00 | |
| 4/24/05 | Sunday | 10pm | 7a | | | | | 9   00 | |
| | TOTALS: | | 11pm/7a | | | | | 39½  50 | |

NOTE: Time Sheet MUST be completely filled out, hours calculated, signed by employee and completed with Authorization Signature

_____
Employee Signature

Nicki Russo
_____
Supervisor Authorization Signature

_____
Director's Signature

Payroll Notes:

_____

TS Form
Revised: 06/10/04

# CHILD, Inc. - WEEKLY TIME SHEET

For ALL Hourly Workers – Including Support/Back-Up Time @ Shelters

Employee Name: Miriam Hyman

Department: GTH / L00

For Week Ending: (Sunday's Date) - 5/1/05

Supervisor: Nicki Russo / Robbie MacDonna

| DATE | Day of Week | Morning (AM) In | Morning (AM) Out | Afternoon (PM) In | Afternoon (PM) Out | Additional Hours In | Additional Hours Out | Total Hours | FOR NOTES and/or OFFICE USE ONLY |
|------|-------------|-----------------|------------------|-------------------|--------------------|--------------------|---------------------|-------------|----------------------------------|
|  | Monday |  |  |  |  |  |  |  |  |
| 4/26/05 | Tuesday | 10 pm | 8 am |  |  |  |  | 10 |  |
| 4/27/05 | Wednesday | 10pm | 8am |  |  | 9pm | 10:30pm | 10 12.75 | staff meeting |
| 4/28/05 | Thursday | 9am 10pm | 10:45am 8am | 10pm | 8am |  |  | 12.75 10 | Staff meeting |
|  | Friday |  |  |  |  |  |  |  | T = 72.4 |
|  | Saturday |  |  |  |  |  |  |  |  |
|  | Sunday |  |  |  |  |  |  |  |  |
|  | TOTALS: |  |  |  |  |  |  | 32.75 |  |

NOTE: Time Sheet MUST be completely filed out, hours calculated, signed by employee and completed with Authorization Signature

_____
Employee Signature

Nicki Russo
Supervisor Authorization Signature

_____
Supervisor Authorization Signature

Robbie MacDonna
Director's Signature

Payroll Notes: _____

TS Form
Revised: 06/10/04

CHILD, Inc. - WEEKLY TIME SHEET

For ALL Hourly Workers – Including Support/Back-Up Time @ Shelters

Employee Name: Mirian Hyman, Child Youthworker For Week Ending: (Sunday's Date) - 5/8/05

Department: GTH / L00          Supervisor: Nicki Russo / Robbie MacDonna

| DATE | Day of Week | Morning (AM) In | Morning (AM) Out | Afternoon (PM) In | Afternoon (PM) Out | Additional Hours In | Additional Hours Out | Total Hours | | FOR NOTES and/or OFFICE USE ONLY |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/2/05 | Monday | 11 pm | 7 am | | | | | 8 | 00 | |
| 5/3/05 | Tuesday | 11 pm | 9 am | | | | | 10 | 00 | |
| 5/4/05 | Wednesday | 10 pm | 8 am | | | | | 10 | 00 | |
| 5/5/05 | Thursday | 8 pm | 6 am | | | | | 10 | 00 | |
| | Friday | | | | | | | | | |
| | Saturday | | | | | | | | | |
| | Sunday | | | | | | | | | |
| | TOTALS: | 38 | | | | | | 38 | 00 | |

NOTE: Time Sheet MUST be completely filled out, hours calculated, signed by employee and completed with Authorization Signature

_____
Employee Signature

_Nicki Russo_
Supervisor Authorization Signature

_Robbie McManus_
Director's Signature

Payroll Notes: _____

TS Form
Revised: 06/10/04

# CHILD, Inc. - WEEKLY TIME SHEET

For ALL Hourly Workers – Including Support/Back-Up Time @ Shelters

Employee Name: Miriam Hyman

Department: GTH / L00  Child/Youth worker

For Week Ending: (Sunday's Date) - 5-15-05

Supervisor: Nicki Russo / Robbie MacDonna

| DATE | Day of Week | Morning (AM) In | Morning (AM) Out | Afternoon (PM) In | Afternoon (PM) Out | Additional Hours In | Additional Hours Out | Total Hours | FOR NOTES and/or OFFICE USE ONLY |
|------|-------------|-----------------|------------------|-------------------|--------------------|---------------------|----------------------|-------------|----------------------------------|
| | Monday | | | | | | | | |
| 5-10-05 | Tuesday | 9AM | 12pm | 11pm | 9/11/4 | | | 13 | staff meeting |
| 5-11-05 | Wednesday | 10pm | 8am | | | | | 10 | |
| 5-12-05 | Thursday | 10pm | 8am | | | | | 10 | 7=71 |
| | Friday | | | | | | | | |
| | Saturday | | | | | | | | |
| | Sunday | | | | | | | | |
| | TOTALS: | | | | | | | 33 | |

NOTE: Time Sheet MUST be completely filled out, hours calculated, signed by employee and completed with Authorization Signature

_____
Employee Signature

Nicki Russo
Supervisor Authorization Signature

Robbie McDonna
Director's Signature

Payroll Notes: _____

TS Form
Revised: 06/10/04

## CHILD, Inc. - WEEKLY TIME SHEET

For ALL Hourly Workers – Including Support/Back-Up Time @ Shelters

Employee Name: Miriam Lyman

Department: GTH / L00

For Week Ending: (Sunday's Date) - 5/22/05

Supervisor: Nicki Russo / Robbie MacDonna

| DATE | Day of Week | Morning (AM) In | Out | Afternoon (PM) In | Out | Additional Hours In | Out | Total Hours | FOR NOTES and/or OFFICE USE ONLY |
|---|---|---|---|---|---|---|---|---|---|
| 5-16-05 | Monday | 11 pm | 7 am | | | | | 8 | |
| | Tuesday | | | | | | | | |
| | Wednesday | | | | | | | | |
| | Thursday | | | | | | | | |
| 5-20-05 | Friday | 11 pm | 10:30 am | | | | | 11.5 | |
| 5-21-05 | Saturday | 10:30 pm | 9:30 am | | | | | 11 | |
| 5-22-05 | Sunday | 10:00 pm | 7:00 am | | | | | 9 | |
| | TOTALS: | | | | | | | 39.5 | |

NOTE: Time Sheet MUST be completely filled out, hours calculated, signed by employee and completed with Authorization Signature

_____
Employee Signature

Nicole Russo
Supervisor Authorization Signature

Robbie MacDonna
Director's Signature

Payroll Notes: _____

_____

TS Form
Revised: 06/10/04

CHILD, Inc. - WEEKLY TIME SHEET

For ALL Hourly Workers – Including Support/Back-Up Time @ Shelters

Employee Name: Miriam Hyman

For Week Ending: (Sunday's Date) - 5/29/05

Department: GTH / L00

Supervisor: Nicki Russo / Robbie MacDonna

| DATE | Day of Week | Morning (AM) In | Morning (AM) Out | Afternoon (PM) In | Afternoon (PM) Out | Additional Hours In | Additional Hours Out | Total Hours | FOR NOTES and/or OFFICE USE ONLY |
|------|-------------|-----------------|------------------|-------------------|--------------------|--------------------|--------------------|-------------|----------------------------------|
| | Monday | 9am | 12pm | | | | | 3 | staff meeting |
| 5/24/05 | Tuesday | 10pm | 8am | | | | | 10 | |
| | Wednesday | | | | | | | | |
| 5/26/05 | Thursday | 10pm | 8am | | | | | 10 | |
| 5/27/05 | Friday | 11pm | 9am | | | | | 10 | |
| | Saturday | | | | | | | | |
| | Sunday | | | | | | | | |
| | TOTALS: | | | | | | | 33 | |

NOTE: Time Sheet MUST be completely filled out, hours calculated, signed by employee and completed with Authorization Signature

_____
Employee Signature

_Nicki Russo_
Supervisor Authorization Signature

_Robbie MacDonna_
Director's Signature

Payroll Notes:

_____

_____

TS Form
Revised: 06/10/04

## CHILD, Inc. - WEEKLY TIME SHEET

For ALL Hourly Workers – Including Support/Back-Up Time @ Shelters

Employee Name: _Mirian Hyman_

Department: __GTH / LAO__

For Week Ending: (Sunday's Date) - _6-5-05_

Supervisor: __Nicki Russo / Robbie MacDonna__

| DATE | Day of Week | Morning (AM) In | Out | Afternoon (PM) In | Out | Additional Hours In | Out | Total Hours | FOR NOTES and/or OFFICE USE ONLY |
|---|---|---|---|---|---|---|---|---|---|
| 5-31 | Monday | | | 11pm | 7am | | | 8 00 | Janet 6-3-05 |
| | Tuesday | | | | | | | | |
| | Wednesday | | | | | | | | |
| | Thursday | | | | | | | | T= 80½ |
| | Friday | | | | | | | | + 70½ Notice |
| | Saturday | | | | | | | | |
| | Sunday | | | | | | | | 751 hrs |
| | TOTALS: | | | | | | | | |

_____    _Debbie MacDonald_
Employee Signature        Supervisor Authorization Signature

_____
Director's Signature

NOTE: Time Sheet MUST be completely filled out, hours calculated, signed by employee and completed with Authorization Signature

Payroll Notes: _____

_____

TS Form
Revised 06/10/04

**EXHIBIT J**

LEXSEE 1985 DEL. LEXIS 589



Cited
As of: Sep 20, 2007

L. H. DOANE ASSOCIATES, INC., Defendant-Appellant, v. A. BARRY
SEYMOUR, Plaintiff-Appellee.

No. 172, 1984

SUPREME COURT OF DELAWARE

*1985 Del. LEXIS 589*

December 18, 1984, Submitted
April 23, 1985, Decided

**NOTICE:**    [*1]    THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant former employer sought review of a judgment by the Superior Court (Delaware) in favor of appellee former employee in the employee's action for unpaid wages.

**OVERVIEW:** The employee brought suit for unpaid accrued "overtime" and unused "comp" time after leaving his employment. The court affirmed the judgment in favor of the employee. The court held that the parties' original agreement that the employee would receive a fixed salary was modified by an implied agreement based on the parties' conduct regarding the issues of overtime, vacation time, and separation pay. The court also found that the trial court did not abuse its discretion in denying the employer's motion to amend its answer to allege a statute of limitations defense pursuant to *10 Del. Code § 8111* because the motion was made on the eve of trial and because the statute of limitations had not run. The employee was entitled to attorney's fees because the action was properly brought under the Delaware Wage Payment and Collection Act, 19 Del. Code, ch. 11. The court finally held that the employer's argument was made too late, which asserted that the employee's claims were preempted by the Employee Retirement Income Security

Act of 1974 (ERISA), *29 U.S.C.S. § 1001 et seq.* The court noted that the employee's claims fell with the exclusions from ERISA under *29 C.F.R. § 2510.3-1(b)(1).*

**OUTCOME:** The court affirmed the judgment in favor of the employee in his action to recover unpaid accrued "overtime" and unused "comp" time.

**LexisNexis(R) Headnotes**

*Contracts Law > Contract Modifications > General Overview*
[HN1] A course of conduct of parties can modify the parties' express undertaking.

*Labor & Employment Law > Employment Relationships > At-Will Employment > Employees*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Employers*
*Labor & Employment Law > Wage & Hour Laws > Remedies > Costs & Attorney Fees*
[HN2] The definition of the terms "employer" and "employee" subject to the Delaware Wage Payment and Collection Act (Act), 19 Del. Code, ch. 11, are broadly stated so as to include a Subchapter "S" corporation as well as a shareholder-employee within the Act's coverage.

**JUDGES:** Before HORSEY, MOORE and CHRISTIE, Justices.

**OPINION BY:** BY THE COURT; HENRY R. HORSEY

**OPINION**

*ORDER*

This 23rd day of April, 1985, upon consideration of the briefs and the contentions of the parties at oral argument, it appears to the Court that:

(1) This is a wage dispute (hotly contested) between L. H. Doane Associates, Inc., a Subchapter "S" engineering firm doing business as a partnership (hereafter "Doane" or "employer"), and A. Barry Seymour, a former associate and partner (hereafter "Seymour" or "employee"), whose employment by the firm ended with his resignation in June, 1979. In 1980, Seymour filed a claim for unpaid wages in the Court of Common Pleas, New Castle County; and following a non-jury trial in January, 1983, Seymour was awarded a judgment of something less than $ 3,000 for unpaid accrued "overtime" in lieu of vacation pay, with interest and attorney's fees.

(2) Doane took an appeal on the record to Superior Court; and that Court affirmed under *Levitt v. Bouvier, Del.Supr., 287 A.2d 671 (1972).* The Court found [*2] substantial evidence to support the Trial Court's findings of fact, no error of law, and no abuse of discretion.

(3) The Trial Court had found plaintiff Seymour to be entitled to cash payment for unused "comp" time for overtime credited to his payroll record, notwithstanding the parties' original agreement that he receive a fixed salary regardless of number of hours worked. In a bench ruling, the Court stated, "that the establishment of the vacation journal confirms Mr. Seymour's testimony, that at some point that [original] policy was changed . . . [and] the corporation . . . whether unwittingly or knowingly, committed itself to pay [Seymour his overtime over 40 hours a week] either by giving him the overtime, letting him take days off, or alternatively at his termination, the obligation to pay him in cash or some other acceptable equivalent."

(4) Doane's appeal to this Court is stated to be motivated by concern for the stability of the law and not the money involved. Appellant states, "the decision below must be reversed under *Heideck v. Kent General Hospital* . . . because it enforces as a matter of law an unwritten employer 'policy' [unilaterally] created by the [*3] company bookkeeper." According to appellant, the finding appealed "violates the express holding" of *Heideck v. Kent General Hosp., Inc., Del.Supr., 446 A.2d 1095 (1982)*: that "even a written employer policy in a personnel manual does not create strict contractual obligations." However, appellant misreads *Heideck* and its application to this case.

(5) *Heideck* involved a suit for wrongful termination of employment that turned on whether the employee was employed at will or for a fixed term. This Court affirmed the Trial Court's grant of summary judgment for the employer on the overwhelming evidence that plaintiff was an employee at will. Plaintiff relied in part on the contents of her "Employee Information Booklet" as supporting her claim to employment for a fixed term rather than "at will" status. Rather than rejecting consideration of the booklet (as some jurisdictions have done on the reasoning that such material should be "deemed to be merely a unilateral statement of company policies"), we examined the booklet's contents and found them not to support plaintiff's fixed term claim. Thus, appellant misreads *Heideck* as holding as a matter of law that employer-employee [*4] contractual relations may not be altered by a company's unilateral policy statements.

(6) Appellant Doane also misconstrues the Court's bench ruling quoted above in paragraph (3). Doane states that the Trial Court committed legal error by ruling that a change in "policy" was enforceable as a matter of law, in violation of this Court's "express holding" in *Heideck*. We think a fair construction of the bench ruling is that reached by Superior Court, *i.e.,* that the parties' original contract "was modified by an implied agreement consisting of the conduct of parties involving the very issue of overtime, vacation time and separation pay (citations omitted) . . . The facts in the instant case are clearly distinguishable from those in *Heideck* where here [sic] Seymour relied on the continuous practice as reflected in testimony and documentary evidence that an arrangement regarding overtime compensation was a matter of accepted practice. [Thus,] notwithstanding the controverted evidence in this case, sufficient evidence exists from which the Court could properly draw the conclusion reached." Clearly, [HN1] a course of conduct of parties can modify the parties' express undertaking. [*5] *Collins & Aikman Corporation v. Compo Industries, Inc., Del.Supr., No. 233, 1983, McNeilly, J. (May 1, 1984) (ORDER).*

(7) The Trial Court did not abuse its discretion in denying Doane's motion to amend its answer to raise a statute of limitations' defense under *10 Del. C. § 8111*. The motion was not filed until the eve of trial and after the case had been pending at issue for over a year and a half in the Court of Common Pleas; and, in any event, the suit was filed within one year of Doane's rejection of Seymour's request for compensation for overtime work. *See H & H Poultry Co., Inc. v. Whaley, Del.Supr., 408 A.2d 289 (1979); Mergenthaler, Inc. v. Jefferson, Del.Supr., 332 A.2d 396 (1975);* and *Plant v. Catalytic Construction Co., Del.Super., 287 A.2d 682 (1972).*

(8) Seymour's action was properly brought under the Delaware Wage Payment and Collection Act, 19 *Del. C.,*

ch. 11, thereby permitting the Trial Court to assess Seymour's reasonable attorney's fees and other costs against Doane. *19 Del. C. § 1113.* [HN2] Chapter 11's definition of the terms "employer" and "employee" subject to the Act are broadly stated so as to include a Subchapter "S" corporation [*6] as well as a shareholder-employee within the Act's coverage. Seymour's claim was for wages, not a share of the net profits of the corporation. *See also Fairfield Builders V. Vattiliana, Del.Supr., 304 A.2d 58 (1973).*

(9) Doane's eleventh-hour assertion before Superior Court that federal statute law known as "ERISA", the Employee Retirement Income Security Act of 1974, *29 U.S.C. §§ 1001, et seq.*, preempts Seymour's claim for unpaid wages either at common law or under 19 *Del. C.,* ch. 11 comes too late to be considered. The record in this case was made before the Court of Common Pleas. In any event, Seymour's claims are for unpaid wages in the form of overtime pay and not for the recovery of benefits under a welfare plan. Hence, they appear to fall within the exclusions of *29 C.F.R. § 2510.3-1(b)(1).*

NOW, THEREFORE, IT IS ORDERED that the judgment of Superior Court be and it hereby is

AFFIRMED.

BY THE COURT:

Henry R. Horsey, Justice

EXHIBIT

*ORDER*

This 1st day of May, 1984, it appears to the Court that:

1. The appeal and cross-appeal here involved have resulted from the denial of injunctive and other relief sought in the Court of Chancery by Collins & Aikman [*7] Corporation (C&A) pursuant to an exclusive license agreement under patent rights and know-how in processes and compositions relating to tufted carpet having a synthetic resin backing.

2. The agreement specifically provides it "shall be construed, interpreted and enforced in accordance with and under the laws of the State of New York" where it was executed.

3. The Chancellor wrote two exhaustive opinions dated July 6, 1982 and October 12, 1982 dealing with the issues raised by the parties and further set forth in detail the consequences flowing therefrom by Order dated June 24, 1983.

4. The findings of fact upon which the Chancellor found the license agreement to be modified under existing New York law permitting modification of contracts by conduct of the parties are clearly supported by the record.

5. The consequences flowing from the contract as modified enunciated in the Chancellor's Order of June 24, 1983 are clearly the product of an orderly and deductive process.

6. We find no reasons to reach collateral issues raised in the appeal and cross-appeal although that is not to say we have not considered them.

NOW, THEREFORE, for the reasons stated in the Chancellor's Opinions [*8] dated July 6, 1982 and October 12, 1982, and the Order of June 24, 1983, the judgment of the Court of Chancery be and it is hereby

AFFIRMED.

BY THE COURT:

John J. McNeilly, Justice

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MIRIAM HYMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-227-SLR |
| | ) | |
| CHILD, INC., | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |

## <u>ORDER</u>

**AND NOW**, this _____ day of _____, 2007, upon consideration of the

Motion of Defendant, Child, Inc., for Summary Judgment and plaintiff's Response thereto, it is

hereby ordered that the Motion is granted and summary judgment is entered in favor of

defendant, Child, Inc., and against plaintiff.

_____

J. _____

15/534533.v1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MIRIAM HYMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-227-SLR |
| | ) | |
| CHILD, INC., | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I, Kevin J. Connors, hereby certify that two (2) copies of the **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANT, CHILD, INC., FOR SUMMARY JUDGMENT** in the above-captioned matter have been served by E-File and regular U.S. mail to the following:

R. Stokes Nolte, Esquire
Nolte & Associates
1010 N. Bancroft Parkway, Suite 21
Wilmington, DE 19805

                    MARSHALL, DENNEHEY, WARNER,
                    COLEMAN & GOGGIN


              BY: __*/s/ Kevin J. Connors*__
                    Kevin J. Connors, Esquire – I.D. # 2135
                    1220 N. Market Street, 5th Floor
                    P.O. Box 8888
                    Wilmington, DE  19899
                    (302) 552-4302
                    Attorney for Defendant, Child, Inc.

DATED:  September 21, 2007
15/534530.v1