IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MIRIAM HYMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civ. No. 06-227-SLR |
| ) | |
| CHILD INC., ) | |
| ) | |
| Defendant. ) | |

R. Stokes Nolte, Esquire, of Reilly, Janiczek, & McDevitt, Wilmington, Delaware. Counsel for Plaintiff.

Kevin J. Connors, Esquire, of Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: December 6, 2007
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Miriam Hyman ("plaintiff") filed her complaint against Child, Inc. ("defendant") on April 6, 2006. (D.I. 1) In her complaint, plaintiff alleges that she was wrongfully terminated from her job with defendant in violation of Title VII of the Civil Rights Act of 1999 (42 U.S.C. § 1981(a)[1]). (Id.) Plaintiff further alleges that defendant breached the terms of its employment contract with plaintiff, including a covenant of good faith and fair dealing implied in the contract pursuant to the laws of the State of Delaware. (Id.) Plaintiff seeks damages including punative damages, attorney fees, and costs. (Id.) The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367. Presently before the court is defendant's motion for summary judgment. (D.I. 22) For the reasons stated below, the court grants defendant's motion.

## II. BACKGROUND

Plaintiff is a twenty-six year old African American female. She was employed by defendant in the position of "part time Child/Youth Service Worker" at the Governor Charles L. Terry, Jr. Emergency Home for Children and Youth from March 23, 2005 until she was terminated on June 3, 2005. The current director of defendant's specialized foster care services division is African-American, as are 80% of the foster

---

[1] All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

care staff. (D.I. 21, ¶ 7) The previous, but not current, director of defendant's shelter services division is African-American, as are 73% of the shelter services staff. (Id.)

Plaintiff and defendant entered into a contract of employment prior to the start of her employment on March 22, 2005. (D.I. 24, ex. A) The contract provided that, upon her hire, plaintiff "[would] be on orientation for a six-month period when [her] performance will be evaluated," and "[was] expected to attend all staff meetings and training sessions as directed by [her] supervisor." (Id.) The parties understood that "either party may terminate th[e] employment arrangement . . . after fifteen (15) calendar days' notice, unless [plaintiff] is terminated for cause." (Id.) Defendant is an "at-will employer." (Id.; D.I. 21 at ¶ 5)

The contract further provided that plaintiff would work "fifteen training hours, two weeks after training is complete and then become on call back-up, to work as required, hours not to exceed 25 hours per week." (D.I. 24, ex. A) Defendant's "Schedule Policy" for part time employees also stated that "[t]he Child/Youth Service Worker will be scheduled not to exceed hours of 25 hours per week," but also provided that "[t]his may be increased or decreased based on need, but must never exceed 35 hours per week." (D.I. 24, ex. B) The Schedule Policy also provides that

> [i]f a staff member would like to request not to be scheduled certain days or times (for appointments, weddings, church services, classes, etc.), but is still able to work the part-time hours for that week, at least one month's advance notice *must* be given. Requests should be written in the appropriate format provided by the Scheduling Coordinator. These requests will be taken into strong consideration.

(Id.) If unable to work the part time work week, an employee must complete a "leave of absence request," which must "be given to the office at least one month in advance,"

2

along with a "Request for or Notification of Absence Form," which must be completed, approved by the Director and submitted for approval to the Executive Vice President. (Id.) After schedules are posted, employees are required to find coverage for any shifts they cannot complete, and execute a "Shift Change Request Form" to be approved by the scheduling coordinator. (Id.) Plaintiff signed a copy of the Schedule Policy on March 22, 2005. (Id.)

The first week of plaintiff's employment, she worked about 12 hours. (D.I. 20, ex. I; D.I. 24, ex. C) Thereafter, plaintiff worked the following hours:

| Week ending | Hours worked |
|---|---|
| April 3, 2005 | 33 |
| April 10, 2005 | 31.5 |
| April 17, 2005 | 33 |
| April 24, 2005 | 39.5 |
| May 1, 2005 | 34.05[2] |
| May 8, 2005 | 38 |
| May 15, 2005 | 33 |
| May 22, 2005 | 42.5[3] |

---

[2]Plaintiff has submitted "GTH Weekly Time Sheet[s]," while defendant has submitted "Child, Inc. – Weekly Time Sheet[s]" for each week of plaintiff's employment. (D.I. 20, ex. I; D.I. 24, ex. C) These documents are largely consistent for the given weeks. For the week ending May 1, 2005, plaintiff's time sheet, signed by Ms. Patricia Payne, reflects that she worked 34.05 hours (D.I. 24, ex. C); defendant's time sheet for the same week, signed by plaintiff's supervisor Nikki Russo and director Robin MacDonna, reflects that plaintiff worked 32.75 hours (D.I. 20, ex. I).

[3]For the week ending May 22, 2005, plaintiff's time sheet, which is signed by only herself, reflects that she worked 42.5 hours (D.I. 24, ex. C); defendant's time sheet for the same week, signed by plaintiff's supervisor Nikki Russo and director Robin MacDonna, reflects that plaintiff worked 39.5 hours (D.I. 20, ex. I).

3

| May 19, 2005 | 33 |
| --- | --- |
| June 5, 2005 | 8[4] |

(Id.) Plaintiff primarily worked overnight shifts, for example, 10:30 p.m. to 9:30 a.m., which hours varied. (Id.)

On May 25, 2005, plaintiff was assaulted by a thirteen year old, Caucasian male resident during the course of her work. Plaintiff asserts that she was bitten several times. (D.I. 24 at ¶ 6) Plaintiff approached defendant about pressing charges against the resident child. Defendant advised plaintiff that it would not support this action. (Id.; D.I. 27) Defendant claims that the assault resulted from plaintiff's unauthorized[5] restraint of the child, and defendant "did not want plaintiff to press charges against the white minor resident because plaintiff herself handled the incident inappropriately by restraining the resident in contravention of Child, Inc. policy."[6] (D.I. 27)

On May 27, 2005, plaintiff submitted a letter to defendant, to the attention of Director Robin MacDonna Hoosty ("Hoosty"), requesting schedule variances so that she could perform in a role in a theater production taking place about an hour away. (D.I.

---

[4]Plaintiff was terminated on June 3, 2005; she worked only one, eight-hour day (May 31, 2005) during this week. (D.I. 20, ex. I)

[5]Defendant has submitted a copy of a "Child, Inc. Policy Regarding Child Abuse/Neglect in Children's Emergency Home Care," signed by plaintiff on March 22, 2005. (D.I. 20, ex. G) This document generally references Delaware Child Abuse Law regarding abuse, but does not specifically iterate guidelines for contact between employees and residents. (Id.)

[6]In support, defendant provides an affidavit by its Director, Robin MacDonna Hoosty, who states that this incident appeared to have resulted from plaintiff "picking on the resident by refusing to wash his clothes," which was required by defendant's policy. (D.I. 21 at ¶ 11)

4

24, ex. C) In her letter, plaintiff stated that "at the time of hire [she] was told that there would be two individuals at night and that [she] would be doing between 6 to 8 hours a night[.]" (Id.) Plaintiff expressed a hope that another individual would be hired so that she "could really make these productions work." (Id.) Plaintiff informed Hoosty that she would have the following availability between July 1 and August 6, 2005:

| Night shift commencing: | Availability |
| --- | --- |
| July 1, 2, 5, 6, 7, 11 | 10 p.m. - 7 a.m. |
| July 15, 16, 17, 19 | not available |
| July 3, 20, 21, 29, 30, 31 | 12 a.m. - 9 a.m. weekdays, 10:30 a.m. weekends |
| August 2, 3, 4 | 12 a.m. - 9 a.m. weekdays, 10:30 a.m. weekends |

(Id.) Plaintiff stated that she "realize[d] this is a lot" and provided a schedule suggestion, along with the suggestion that her "hours could be reduced to about 20 hrs. because of all of the travel until [she was] finished with this show." (Id.) She also noted that she "believe[d] there are two staff meetings somewhere in there that I would be unable to attend due to rehearsal." (Id.)

Plaintiff was discharged on June 3, 2005.[7] (Id., ex. E) Hoosty cites multiple reasons for plaintiff's termination: (1) plaintiff's alleged unauthorized restraint of the Caucasian resident; (2) failing to follow instructions and following through with tasks, such as inventory tasks and getting lost while transporting residents in her vehicle; (3)

---

[7]Plaintiff states that she never received a response to her May 27, 2005 letter, and no additional documentation regarding plaintiff's employment or termination has been cited or referred to by the parties.

5

"[p]laintiff was difficult to supervise" because she was defensive, "would not address her immediate supervisor directly," and "projected her own values onto residents"; (4) missing mandatory staff meetings on April 28, 2005 and May 24, 2005; and (5) plaintiff advised defendant on May 24, 2005 that she would not be able to attend two future meetings. (D.I. 21 at ¶¶ 8-11)  Plaintiff asserts that defendant illegally retaliated against her by terminating her employment in response to her request to file charges against the Caucasian resident and based upon her request to accommodate her hours. (D.I. 24 at ¶ 9)

## IV. DISCUSSION

### A. Section 1981 Claim

#### 1. Standard

Racial discrimination claims under § 1981 must be evaluated according to the burden-shifting analysis set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). See Stewart v. Rutgers, the State University, 120 F.3d 426, 432 (3d Cir. 1997). Under the McDonnell Douglas-Burdine framework, a plaintiff must first establish a prima facie case by a preponderance of the evidence. See Stewart, 120 F.3d at 432.

> In order to state a claim under § 1981, a plaintiff must "allege facts in support of the following elements: (1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts. . . ."

Brown v. Philip Morris, Inc., 250 F.3d 789, 797 (3d Cir. 2001) (second and third

6

alterations in original) (omission in original) (quoting Yelverton v. Lehman, No. Civ. A. 94-6114, 1996 WL 296551, at *7 (E. D. Pa. June 3, 1996), aff'd, 175 F.3d 1012 (3d Cir. 1999)). See also Azubuko v. Riordan, No. Civ. A. 05-095-SLR, 2005 WL 914778, at *3 (D. Del. Apr. 4, 2005).

> After an employee has established a prima facie case, this creates a presumption of discriminatory intent by the defendant-employer. The burden then shifts to the defendant to produce evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection which would support a jury finding that unlawful discrimination was not the cause of the adverse employment action. If the defendant's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case. The burden then falls upon the plaintiff to prove that the employer's proffered reason for the employment action was not the true reason for the decision[,] but was instead pretextual.

Stewart, 120 F.3d at 432 (internal citations and quotations omitted).

### 2. Discussion

Defendant has articulated several legitimate reasons for plaintiff's termination in this case, supported by the Hoosty affidavit. Plaintiff does not specifically contest these reasons, but notes that "[n]one of the allegations contained in the Hoosty affidavit," such as missing staff meetings or ever being disciplined as a result, "are supported by documentation contained in plaintiff's employment file." (D.I. 24 at ¶ 14) Plaintiff argues that "if plaintiff did in fact miss a mandatory staff meeting on April 28, 2005 . . . no discipline resulted until after plaintiff's request to modify her part time hours and after her request to press charges against her assailant." (Id. at ¶ 15) (internal quotations omitted) According to plaintiff, "[t]he fact that plaintiff's termination [was] contemporaneous to her May 25, 2005 assault and her May 27, 2005 letter raises a

question of fact as to the discriminatory motivation for defendant's actions." (Id.)

The court disagrees. Plaintiff has put forward no evidence which could tend to discredit Hoosty's account of plaintiff's work performance and attendance. Plaintiff does not contest the fact that she missed at least one mandatory staff meeting, in violation of her employment contract. Plaintiff was terminated several days after she notified defendant that she would be missing two mandatory staff meetings.[8] She was still within her six month orientation period at this time. On this record, defendant appears to have had numerous, uncontroverted business reasons for terminating plaintiff's employment.

The majority of defendant's employees are African-American. Plaintiff's primary evidence of discrimination is her allegation that one Caucasian employee of defendant, who was similarly assaulted by a Latino resident in the course of her employment, was encouraged to press criminal charges against the resident following the assault. (D.I. 24 at ¶ 18) According to plaintiff, this Caucasian employee was "actively assisted and supported" by defendant, and "did not suffer any adverse employment action due to her criminal pursuit." (Id.) In contrast, plaintiff contends that, due to her race, she was terminated as a result of pursuing criminal action following the May 25, 2005 incident.

Defendant asserts that the circumstances surrounding the Caucasian employee's assault by the Latino resident were different than plaintiff's incident.

---

[8]Plaintiff's request was submitted over a month prior to the date she first requested her schedule to be altered; it is not clear whether the manner in which plaintiff submitted her request (by informal letter) could have complied with defendant's policies, though it appears no forms accompanied her request. Defendant has not argued that plaintiff did not comply with the Scheduling Policy with respect to the manner in which she requested accomodations.

8

Defendant claims that the Latino resident had been sent to defendant on a "no tolerance" basis, he "threatened [the Caucasian employee] and affirmatively assaulted her," and it was subsequently determined that the resident would be removed from defendant's facility, necessitating the need for pressing charges. (D.I. 20 at ¶ 8) In contrast, defendant avers that plaintiff instigated contact with a resident with mental health problems, in violation of defendant's policy.

Even taking the facts in a light most favorable to plaintiff, plaintiff's allegation that she was terminated for seeking to file charges against a resident, while one Caucasian employee was not, does not alone support a finding that defendant's proffered reasons for termination were pretextual or infer that race was a factor in defendant's decision. As the Third Circuit has stated,

> just as an employer cannot insulate itself from claims of racial discrimination by identifying a token black person whom it treated with abnormal leniency, a black plaintiff cannot establish racial discrimination by singling out one white person who was treated more favorably when there were other white persons who were treated less favorably than other black persons. . . . [T]o hold otherwise would be to permit the inference of discrimination any time a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably.

Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 646 (3d Cir. 1998) (citing Bush v. Commonwealth Edison Co., 990 F.2d 928, 931 (7th Cir. 1993)). Plaintiff was terminated shortly after she was assaulted (May 25, 2005), but also shortly after she submitted her notification that she would miss mandatory meetings (May 27, 2007); the timing of plaintiff's termination, therefore, is insufficient to create a genuine issue of material fact in this regard. For the aforementioned reasons, the court finds that plaintiff has not met her burden to establish that a reasonable jury could find in her

9

favor on her section 1981 discrimination claim.

## B. Breach of Contract

Plaintiff testified that she mentioned to her supervisors on several occasions that she was scheduled for more hours than the 25 per week enumerated in her part time employment contract. (D.I. 20, ex. F) Plaintiff was told that defendant was interviewing other individuals and needed the help, and agreed to work the extra hours. (Id.) While employed by defendant, plaintiff consistently worked more than 25 hours per week, and worked more than 35 hours on three occasions, which was explicitly proscribed by her employment contract. Plaintiff asserts that "defendant took advantage of plaintiff's affable demeanor and when she pushed back, defendant terminated her based on her race." (D.I. 24 at ¶ 23)

As discussed previously, the court finds plaintiff's evidence insufficient to create an inference that race was a factor in her termination. To the extent that defendant breached the employment contract with plaintiff by requiring her to work more than 35 hours per week,[9] defendant argues that plaintiff acquiesced to this change. Plaintiff admits that, despite discussing her hours with supervisors, she agreed to the extra hours. (D.I. 20, ex. F) Indeed, a contract for employment at-will may be modified by the parties' course of conduct. See L.H. Doane Associates, Inc. v. Seymour, 1985 Del. LEXIS 589 (Del. April 23, 1985).

Moreover, under Delaware law, an at-will contract for employment has a

---

[9]Because defendant's Schedule Policy states that the maximum of 25 hours per week "may be increased . . . based on need," it is not clear that defendant was in breach for scheduling plaintiff for between 25 and 35 hours per week.

10

"duration indefinite." See Bailey v. City of Wilmington, 766 A.2d 477, 480 (Del. 2001). There are "four primary situations in which an employer's authority to terminate an employee is limited by the implied covenant of good faith and fair dealing: (1) where the employee's termination violates public policy; (2) where the employer misrepresents an important fact and the employee relies on it when deciding to accept a new position or to remain at a present one; (3) where the employer uses its superior bargaining power to deprive an employee of identifiable compensation related to an employee's past service; and (4) where an employer through deceit, fraud, and misrepresentation manipulates the record to create fictitious grounds to terminate employment." Id. (internal quotations omitted). Plaintiff alleged in her complaint that her termination violates Delaware's public policy, but has provided no support for this claim in response to defendant's motion. (D.I. 24) Further, plaintiff has identified no conduct on the part of defendant which could amount to fraud, deceit, or misrepresentation.

On the present record, the court finds that plaintiff has alleged no set of facts that could suffice to demonstrate her breach of contract claims. Judgment for defendant, therefore, is appropriate in this case.

## V. CONCLUSION

For the aforementioned reasons, the court grants defendant's motion for summary judgment. An appropriate order shall issue.

11